## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| STUART SWAZIEK, derivatively on behalf of DISCOVER FINANCIAL SERVICES and CAPITAL ONE FINANCIAL CORP., <br><br> Plaintiff, <br><br> vs. <br><br> ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA A. GLASSMAN, THOMAS G. MAHERAS, MICHAEL H. MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG, <br><br> Defendants, <br><br> and <br><br> DISCOVER FINANCIAL SERVICES and CAPITAL ONE FINANCIAL CORP., <br><br> Nominal Defendants. | Case No. 1:26-cv-9391 <br><br><br> **JURY TRIAL DEMANDED** |

## <u>VERIFIED SHAREHOLDER DOUBLE DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Stuart Swaziek ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendants Discover Financial Services ("Discover" or the Company") and Capital One Financial Corp. ("Capital One"), files this Verified Shareholder Double Derivative Complaint against Roger C. Hochschild ("Hochschild"), John T. Greene

("Greene"), R. Mark Graf ("Graf"), Mary K. Bush ("Bush"), Candace H. Duncan ("Duncan"), Joseph F. Eazor ("Eazor"), Cynthia A. Glassman ("Glassman"), Thomas G. Maheras ("Maheras"), Michael H. Moskow ("Moskow"), Daniela O'Leary Gill ("Gill"), John B. Owen ("Owen"), David L. Rawlinson II ("Rawlinson"), and Jennifer L. Wong ("Wong") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Discover, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Discover and Capital One, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder double derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 20, 2019 to January 17, 2024, both dates inclusive (the "Relevant Period").

2

2. The double derivative claims asserted in this complaint are the claims that belong to Discover, which is the wholly owned subsidiary of Capital One, and are thus claims that ultimately belong to Capital One.

3. Discover was a digital banking and payment services company based in Riverwoods, Illinois, and incorporated in Delaware. Discover operated a nationwide consumer banking business, which included credit cards, private student loans, personal loans, home loans, deposit products, and payment-processing services. Discover generated substantial revenue from interchange and discount fees paid by merchants that accepted Discover-branded payment cards. Further, Discover serviced private student loans across the United States, which were subject to various consumer protection laws, in addition to extensive supervision and regulation by the Federal Reserve as a bank holding company and provider of consumer financial services.

4. Capital One is a financial services holding company that operates as a payment provider and financial institution for consumers, small businesses, and commercial clients. Capital One's primary operations are divided into credit card, consumer banking, and commercial banking services. In addition to offering credit cards, Capital One offers debit cards, bank lending, treasury management, and consumer lending. Capital One is also subject to extensive regulation and supervision by applicable federal and state laws as a banking organization, such as the Federal Reserve and the Federal Deposit Insurance Corporation ("FDIC").

5. On January 6, 2025, Discover and Capital One filed a joint proxy statement with the SEC detailing the proposed acquisition of Discover by Capital One, which was completed on May 18, 2025 (the "Merger"). Under the merger agreement, Discover was acquired by Capital One, with Capital One as the surviving corporation.

6.     Leading up to and throughout the Relevant Period, the Individual Defendants either made or caused the Company to engage in various forms of conduct that violated banking and consumer protection laws, and *inter alia,* resulted in significant consumer refunds, civil penalties, and government authority action.

7.     For example, beginning no later than 2007, Discover misclassified millions of consumer credit cards as commercial cards, resulting in erroneous payments from merchants being charged commercial interchange rates on consumer credit card transactions ("Card Misclassification Misconduct"). For more than 15 years, Discover improperly charged higher interchange fees and consequently misreported its revenues in its financial reports. Accordingly, the FDIC issued a Consumer Compliance Report of Examination (the "2021 ROE"), which found that Discover had engaged in unsafe or unsound banking practices and failed to establish and maintain a proper compliance management system ("CMS"). Later, in 2023, the FDIC issued a Consent Order (the "2023 Consent Order"), finding once again that Discover failed to maintain an effective CMS to ensure compliance with applicable laws.

8.     Further, in 2015, the Consumer Financial Protection Bureau ("CFPB") issued a Consent Order (the "2015 CFPB Order") against Discover concerning its student loan servicing operations, finding that Discover engaged in deceptive and unfair practices (the "Student Loan Misconduct"). For instance, Discover misrepresented amounts owed by borrowers, made improper collection calls, and improperly refused to send borrowers required Form 1098-E statements. Later, in 2020, the CFPB issued an additional Consent Order (the "2020 CFPB Order"), finding that Discover not only failed to rectify the Student Loan Misconduct, but that Discover engaged in *additional* misconduct. Notably, Discover misstated the amount of interest that borrowers had

paid on their loans, misrepresented multiple factors material to loan terms, and improperly withdrew automatic payments from borrowers' bank accounts without authorization.

9. Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the Company's compliance and risk management, as well as its internal control over financial reporting.

10. For example, on February 20, 2019, the Company filed with the SEC on Form 10-K its yearly financial and operational results for 2018 (the "2018 10-K"), which expressed confidence in Discover's compliance with regulatory bodies, stating that "[o]ur risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well," and that Discover's risk management department "sets risk management standards and policies that are *consistent with the size and complexity of [Discover's] business, industry practices, and applicable legal and regulatory requirements*."[1]

11. The truth began to emerge on July 20, 2022, when Discover issued a press release disclosing an internal investigation into its improper student loan servicing and related compliance issues, as well as noting that Discover was suspending its share repurchase program (the "July 2022 Press Release"). The July 2022 Press Release stated that:

> During the second quarter of 2022, the company repurchased approximately 5.8 million shares of common stock for $601 million. Shares of common stock outstanding declined by 2.0% from the prior quarter. The company is suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters. The investigation is ongoing and is being conducted by a board-appointed independent special committee.

12. On this news, the price per share of Discover's stock fell $9.80, or 8.9%, from a closing price of $109.80 per share on July 20, 2022, to close at $100.00 per share on July 21, 2022.

---

[1] Unless otherwise stated, all emphasis herein is added.

However, the Individual Defendants continued to conceal the true extent of the Company's regulatory noncompliance, including the Card Misclassification Misconduct and its Student Loan Misconduct.

13. For example, on March 29, 2023, Discover issued an Annual Report for 2022 (the "2022 Annual Report"), where Defendant Hochschild detailed the Company's devotion to compliance, noting the primary areas Discover strengthened its CMS, including:

> Strong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, effective processes that we regularly monitor and test to be certain they are working as designed, [and] [i]dentifying and solving problems before customer harm happens, or when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again.

14. The truth continued to emerge on July 19, 2023, when Discover published a press release titled "Discover Financial Services Reports Second Quarter 2023 Net Income of $901 Million or $3.54 Per Diluted Share," (the "2Q 2023 Press Release"), which addressed the Credit Card Misclassification Misconduct:

> Beginning around mid-2007, Discover incorrectly classified certain credit card accounts into our highest merchant and merchant acquirer pricing tier. …As of June 30, 2023, the Company's consolidated financial statements reflect a liability of $365 million within accrued expenses and other liabilities to provide refunds to merchants and merchant acquirers as a result of the card product misclassification.

> ***

> …An investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing.

> Discover is in discussions with its regulators regarding this matter and corporate governance and risk management . . . [T]he Company received a proposed consent order from the FDIC in connection with consumer compliance. [The FDIC order] does not include the card product classification matter. Additional supervisory actions could occur.

> ***

6

The Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending.

15. On this news, the price per share of Discover's stock fell $19.40, or 15.9%, from a closing price of $121.85 per share on July 19, 2023, to close at $102.45 per share on July 20, 2023. However, because the Individual Defendants continued to conceal the full truth regarding the Card Misclassification Misconduct and the Student Loan Misconduct, the price per share of the Company's common stock remained artificially inflated.

16. The truth fully emerged on January 17, 2024, when Discover announced its financial results for its fourth quarter and full-year of 2023 in a press release (the "4Q 2023 Press Release"), reporting that its "total operating expenses were up $267 million year-over-year, or 18%," and that "[o]ther expense increased as a result of a reserve for customer remediation."

17. The next day, on an earnings call to discuss the results (the "4Q 2023 Earnings Call"), Defendant Owen, the Interim CEO at the time, clarified that Discover "increased [its] investments on risk and compliance in 2022 and 2023 up to about a $500 million level," detailing that Discover has "made improvements in risk and compliance," but still had "quite a bit of work to do."

18. On this news, the price per share of Discover's stock fell by $11.74, or 10.8%, from a closing price of $108.74 on January 17, 2024, to close at $97.00 per share on January 18, 2024.

19. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Discover, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and

7

maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result of the foregoing, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; (5) Discover improperly executed its duties as a student loan servicer by engaging in deceptive and unfair practices, and thus violated regulations on student lending, as stated in the 2015 and 2020 CFPB Orders; (6) Discover's compliance and internal control failures were significant, as demonstrated by the 2015 CFPB Order and the 2020 CFPB Order, which addressed Discover's Student Loan Misconduct and Card Misclassification Misconduct; (7) Discover's repurchase suspension in July 2022 was tied to its Student Loan Misconduct; (8) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm; and (9) as a result of the foregoing, the Individual Defendants' statements about Discover's business, operations, and prospects were materially false and misleading when made.

20. The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company and/or Capital One to fail to correct the false and misleading statements and omissions of material fact alleged herein, while, during the Relevant Period, they caused Discover to repurchase its own common stock at prices that were artificially inflated due to the foregoing misrepresentations. In total, they caused Discover to overpay for repurchases of approximately 57.4 million shares of its own common stock by approximately $784.8 million.

21. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while four of the

Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $2 million.

22. In light of the Individual Defendants' misconduct—which has subjected Discover, its former Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its former CFO, and its entire Board of Directors (the "Board") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— Discover will have to expend many millions of dollars.

23. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24. Before initiating this action, Plaintiff served a pre-suit demand on the Board of Directors of Capital One, dated January 7, 2026, to investigate, remediate, and prosecute the claims alleged herein (the "Litigation Demand"). On January 28, 2026, Simon Auerbach ("Auerbach"), VP Network Litigation, informed Plaintiff that the Litigation Demand has been referred to the Capital One's Board for consideration at their next meeting.

25. On March 12, 2026, Auerbach informed Plaintiff that the Litigation Demand was going to be considered by the Board at its regularly scheduled May 2026 meeting.

26. On May 19, 2026, Auerbach informed Plaintiff's counsel that:

> After careful deliberation, the Board determined, in the exercise of its business judgment and for the reasons summarized above, that it has sufficient information to assess the subject matters of the Demand and that no further investigation into the subject matters of the Demand is necessary or in the best interest of the

9

Company. The Board also determined, in the exercise of its business judgment and for the reasons summarized above, that it is not in the best interests of the Company to commence litigation, or to take any other action requested by the Demand, at this time. The Board therefore refuses the Demand.

27. Over the next few months, Plaintiff's counsel requested that the Board and the Company take steps to secure tolling agreements with the Individual Defendants. The Board and Company refused.

28. No substantive response was thereafter provided by the Board regarding the investigation, or Plaintiff's Litigation Demand. Thus, the Board has refused to act on the Litigation Demand, and such refusal to take substantive steps to properly address the underlying claims was wrongful.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

10

**PARTIES**

**Plaintiff**

33.    Plaintiff is a current shareholder of Capital One common stock. Plaintiff first purchased Discover stock on April 2, 2020, and continuously owned such common stock until May 18, 2025, when Discover was acquired by Capital One, at which time Plaintiff's Discover shares were exchanged for shares of common stock of Capital One, which he has continuously owned since then and to date.

**Nominal Defendant Capital One**

34.    Capital One is a Delaware corporation with its principal executive offices at 1680 Capital One Drive, McLean, Virginia 22102. Capital One's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "COF."

**Nominal Defendant Discover**

35.    Discover was a Delaware corporation with its principal executive offices at 2500 Lake Cook Road, Riverwoods, Illinois 60015. Discover's common stock traded on the NYSE under the ticker symbol "DFS" before the Merger.

**Defendant Hochschild**

36.    Defendant Hochschild served as Discover's CEO and President, and as a director on Discover's board, from October 2018 until his resignation on August 14, 2023.

37.    Discover's Schedule 14A filed with the SEC on March 17, 2023 (the "2023 Proxy Statement") stated the following about Defendant Hochschild:

**CAREER HIGHLIGHTS**

• Chief executive officer and president of Discover since October 2018

• President and chief operating officer of Discover from 2004 to 2018

11

- Executive vice president, chief administrative and strategic officer for Morgan Stanley from 2001 to 2004

- Executive vice president, chief marketing officer - Discover from 1998 to 2001, when Discover was a part of Morgan Stanley

**RELEVANT SKILLS AND EXPERIENCE**

- Deep understanding of the Company's business and the financial services industry

- Strategic planning and business development, risk management, consumer financial services, brand marketing, and information technology and cybersecurity

- Operations and the day-to-day management of a global financial corporation, which plays a critical role in board discussions regarding strategic planning and business development for the Company

**Defendant Greene**

38.     Defendant Greene served as Discover's CFO and EVP from September 18, 2019 until July 2025.

39.     During the Relevant Period, while the Company's stock price was artificially inflated before the schemes were exposed, Defendant Greene made the following sale of Discover common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/15/2022 | 4,443 | $127.95 | $568,464 |

Thus, in total, before the fraud was exposed, Defendant Greene sold 4,443 shares of Discover common stock on inside information, for which he received approximately $568,464 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

12

40. The Form 10-K which Discover filed with the SEC on February 20, 2025, for the year ended December 31, 2024 (the "2024 10-K") stated the following about Defendant Greene:

John T. Greene is our Executive Vice President, Chief Financial Officer ("CFO"). He has held this role since September 2019. Prior to joining Discover, Mr. Greene served as executive vice president, chief financial officer and treasurer at Bioverativ, a global biopharmaceutical company. From 2014 to 2016, he was chief financial officer for Willis Group Holdings, which was preceded by more than eight years at HSBC Holdings where he held CFO positions for several divisions, including retail bank and wealth management, insurance and consumer and mortgage lending. He also held various CFO roles in his 12-year tenure with General Electric from 1993 to 2005. Mr. Greene holds a bachelor's degree in accounting from the State University of New York and an MBA from the Kellogg School of Management at Northwestern University.

**Defendant Graf**

41. Defendant Graf served as Discover's CFO and EVP from April 2011 until September 18, 2019.

**Defendant Bush**

42. Defendant Bush served as a director of Discover from 2007 until approximately June 2, 2023. Defendant Bush also served as the Chair of the Board's Governance and Public Responsibility and a member of the Board's Risk Oversight Committee.

43. During the Relevant Period, while Discover's stock price was artificially inflated before the schemes were exposed, Defendant Bush made the following sale of Discover common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 7/28/2021 | 3,824 | $123.21 | $471,155 |

Thus, in total, before the fraud was exposed, Defendant Bush sold 3,824 shares of Discover common stock on inside information, for which she received approximately $471,155 in total

proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

44.     Discover's Schedule 14A filed with the SEC on March 25, 2022 (the "2022 Proxy Statement") stated the following about Defendant Bush:

> Ms. Bush has served as the chairman of Bush International, LLC, a financial and business strategy advisory firm, since 1991. The firm advises U.S. companies and foreign governments on financial markets, banking and strategic business and economic matters. Ms. Bush was the inaugural head and managing director of the Federal Housing Finance Board, where she established financial policies and oversaw management and safety and soundness for the nation's Federal Home Loan Banks. She also founded and served as the head of the international finance department of Fannie Mae, where she led funding transactions globally, and was appointed by President Reagan as the U.S. Alternate Executive Director of the International Monetary Fund Board. Ms. Bush served on the board of Marriott International, Inc. from 2008 to 2020. Ms. Bush brings extensive leadership experience in banking, international finance, corporate governance and public policy to the Board. Additionally, she brings deep experience in corporate finance and strategy and the operations and regulation of financial services businesses.

**Defendant Duncan**

45.     Defendant Duncan served as a director of Discover from 2014 until the Merger. Defendant Duncan also served as a member and the Chair of the Board's Audit Committee, as well as a member of the Nominating, Governance, and Public Responsibility Committee.

46.     Discover's Schedule 14A filed with the SEC on March 15, 2024 (the "2024 Proxy Statement") stated the following about Defendant Duncan:

**CAREER HIGHLIGHTS**

- Retired managing partner of the Washington, D.C. metropolitan area of KPMG LLP, a global network of professional firms providing audit, tax, and advisory services, serving until November 2013

- Member of KPMG board of directors from 2009 to 2013

14

- Served as chair of the KPMG board's nominating committee, as well as the partnership and employer of choice committee

- Served in various roles at KPMG, including managing partner for audit for the Mid-Atlantic area and audit partner in charge for the Virginia business unit

**RELEVANT SKILLS AND EXPERIENCE**

- Leading and managing a large accounting firm's growth priorities across its audit, tax, and advisory functions in key markets

- Strong financial and accounting background, gained through her many years of experience at KPMG, including her experience as a lead audit partner for major international and domestic companies

- Served clients on a wide range of accounting and operational issues, public securities issuances, and strategic corporate transactions

- Public company accounting, financial statements and corporate finance, corporate governance, and risk management

### Defendant Eazor

47.     Defendant Eazor served as a director of Discover from 2016 until the Merger. Defendant Eazor also served as a member of the Audit Committee.

48.     The 2024 Proxy Statement stated the following about Defendant Eazor:

**CAREER HIGHLIGHTS**

- Retired CEO and president of Clario (formerly ERT and Bioclinica), a global data and technology company for clinical trials, from October 2020 to August 2022

- Former CEO and president of Conifer Health Solutions, LLC, a healthcare business solutions organization, from January 2020 to August 2020

- Former executive vice president and chief customer officer of Oracle Corporation, from July 2019 to January 2020

- Former CEO of Rackspace, a leading managed cloud company, from 2017 to 2019

- Former CEO and president of EarthLink, Inc., a leading communications and IT services provider, from 2014 to 2017

15

- Former business unit leader for Hewlett-Packard and Electronic Data Systems Corporation

**RELEVANT SKILLS AND EXPERIENCE**

- Public company CEO with experience in technology and cybersecurity

- Cybersecurity experience, including business operations incorporating data protection and transmission; proactive strategy and response development; and incident evaluation, management and communications strategy

- International strategy and business development in technology and IT services

- Management consulting experience from his time as a senior partner with McKinsey & Company and as a partner and board member of A.T. Kearney, Inc.

**<u>Defendant Glassman</u>**

49.     Defendant Glassman served as a director of Discover from 2009 until approximately May 11, 2023. Defendant Glassman also served as the Chair of the Board's Audit Committee.

50.     During the Relevant Period, while Discover's stock price was artificially inflated before the schemes were exposed, Defendant Glassman made the following sale of Discover common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 10/26/2021 | 3,200 | $123.93 | $396,576 |

Thus, in total, before the fraud was exposed, Defendant Glassman sold 3,200 shares of Discover common stock on inside information, for which she received approximately $396,576 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the

16

material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

51.     The 2022 Proxy Statement stated the following about Defendant Glassman:

Dr. Glassman was appointed by President Bush as Under Secretary for Economic Affairs at the U.S. Department of Commerce from 2006 to 2009 and as Commissioner of the U.S. Securities and Exchange Commission from 2002 to 2006, including serving as Acting Chair during the summer of 2005. Dr. Glassman is currently a member of the Dow Jones Special Committee. She held various positions during her 12 years at the Federal Reserve, including as Chief of the Financial Reports Section and an Economist in the Capital Markets Section. She also has more than 15 years of experience in financial services consulting, including as a Principal of Ernst & Young LLP and Managing Director of Furash & Company. Dr. Glassman served on the board of Navigant Consulting, Inc. from 2009 to 2019, and was a Senior Research Scholar at the Institute for Corporate Responsibility at the George Washington University School of Business from 2009 to 2021.

Dr. Glassman brings extensive regulatory, corporate governance, risk management, financial services and banking experience to the Board. She holds a Ph.D. in economics and has spent over 45 years in the public and private sectors focusing on financial services regulatory and public policy issues

**Defendant Maheras**

52.     Defendant Maheras served as a director of Discover from 2008 until the Merger, and was named as an Independent Chairman in 2020. Defendant Maheras also served as a member of the Board's Risk Oversight Committee.

53.     The 2024 Proxy Statement stated the following about Defendant Maheras:

**CAREER HIGHLIGHTS**

• Managing partner of Tegean Capital Management, LLC since 2008 and a partner of Iron Park Capital Management, LLC from 2019 to 2023, two investment advisory firms

• Serves as a senior advisor to General Atlantic

• Former chairman and co-CEO of Citi Markets and Banking, the corporate and investment banking division of Citigroup, Inc., where he held roles of increasing responsibility after starting his career as a fixed-income trader at Salomon Brothers

- Served as chairman of the U.S. Treasury Department Borrowing Advisory Committee

- Served as an executive committee member of the board of directors of the Securities Industry and Financial Markets Association

**RELEVANT SKILLS AND EXPERIENCE**

- Leadership within organizations impacting the financial services industry

- Significant risk management, banking, and capital markets experience, including 23 years at Citigroup, Inc. where his responsibilities included leading the global capital markets business

- Operations and the day-to-day management of a global financial services organization

- CEO leadership experience, financial background, and banking and financial services understanding

**<u>Defendant Moskow</u>**

54. Defendant Moskow served as a director of Discover from 2007 until approximately May 11, 2023. Defendant Moskow also served as Chair of the Board's Risk Oversight Committee.

55. During the Relevant Period, while Discover's stock price was artificially inflated before the schemes were exposed, Defendant Moskow made the following sales of Discover common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 5/6/2021 | 3,824 | $115.97 | $443,469 |
| 12/7/2022 | 1,291 | $105.10 | $135,684 |

Thus, in total, before the fraud was exposed, Defendant Moskow sold 5,115 shares of Discover common stock on inside information, for which he received approximately $579,153 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the

18

material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

56. The 2022 Proxy Statement stated the following about Defendant Moskow:

Mr. Moskow is currently Vice Chair and Distinguished Fellow, Global Economy at The Chicago Council on Global Affairs. He retired as president and chief executive officer of the Federal Reserve Bank of Chicago in 2007, where he had served since 1994. Mr. Moskow was a Deputy U.S. Trade Representative, following his appointment by President Bush in 1991, and earlier in his career, held a number of senior positions with the U.S. government, including Undersecretary of Labor at the U.S. Department of Labor, director of the Council on Wage and Price Stability and senior staff economist with the Council of Economic Advisers. Mr. Moskow serves on the board of Flowstone Private Equity Opportunity Fund. He served on the board of CityBase until early 2019 and on the board of Commonwealth Edison Company, a subsidiary of Exelon Corporation, until 2021.

Mr. Moskow brings extensive regulatory, risk management, financial services and banking experience to the Board and has extensive knowledge of the economy and financial markets. Through his senior regulatory positions, particularly in the financial services arena, and service on the boards of other financial institutions, he brings a thorough and insightful perspective to a wide range of issues.

**Defendant Gill**

57. Defendant Gill served as a director of Discover from June 14, 2023 until the Merger. Defendant Gill also served as a member of the Board's Audit Committee and as Interim Chair of the Risk Oversight Committee.

58. The 2024 Proxy Statement stated the following about Defendant Gill:

**Career Highlights**

•Retired from Bank of Montreal ("BMO") in 2021 as its COO, a position she held since 2018

•Served over 25 years at BMO, where she held multiple C-suite roles, including chief auditor and head of the anti-money laundering program and remediation

•At BMO, oversaw P&L, risk management, regulatory affairs, and investor relations

•Founding chair of BMO's Diversity & Leadership Inclusion Council

19

•Before joining BMO, served as a commissioned National Bank Examiner at the Office of the Comptroller of the Currency

•Served on the Board of Directors of Discover Bank since July 2022

•Previously served as a trustee on the board of BMO Funds, Inc.

**Relevant Skills and Experience**

•Over 25 years of financial services leadership experience with emphasis in consumer banking operations

•Deep understanding of governance, risk management, and regulatory oversight of financial institutions

•Advocate of DEI at large financial institutions

**<u>Defendant Owen</u>**

59.     Defendant Owen served as a director of Discover from June 2022 until the Merger. Defendant Owen also served as a member of the Board's Risk Oversight Committee from June 2022 until August 14, 2023. In August 2023, Defendant Owen served as Discover's Interim CEO after Defendant Hochschild's resignation, until February 1, 2024.

60.     The 2024 Proxy Statement stated the following about Defendant Owen:

**CAREER HIGHLIGHTS**

• Served as Interim CEO and President of Discover and Interim President of Discover Bank from August 2023 to January 2024

• Retired in March 2021 as COO of Regions Financial Corporation, one of the nation's largest full-service providers of consumer and commercial banking, wealth management, and mortgage products and services after a successful 12-year tenure

• Held various senior management roles at Regions including head of Operations and Technology, head of Consumer Services Group, head of Regional Banking Group, and head of Enterprise Services and Consumer Banking

• Served on the boards of directors for the Birmingham Business Alliance, Innovation Depot, and the United Way of Central Alabama, as well as the advisory board for the UAB Collat School of Business

20

**RELEVANT SKILLS AND EXPERIENCE**

- Over 38 years of experience in banking and information technology that spans multiple industries including banking, insurance, airlines, and the defense industry

- Valuable expertise in information security, cybersecurity, strategy and operations, and technological innovation within the financial services industry

- Leadership and oversight with digital banking through overhauling mobile banking applications

- Experience in overseeing technological transformation, including the deployment of new mobile applications and the streamlining of technical infrastructure to improve the customer experience all within a full-service digital environment

- Leadership and clear understanding of the overall governance structure associated with a highly regulated industry

- Public company compliance, technology, and climate and sustainability experience

**Defendant Rawlinson**

61.     Defendant Rawlinson served as a director of Discover from approximately February 22, 2021 until the Merger. Defendant Rawlinson also served as a member of the Board's Audit Committee.

62.     The 2024 Proxy Statement stated the following about Defendant Rawlinson:

**CAREER HIGHLIGHTS**

- CEO and President of Qurate Retail, Inc., a Fortune 500 global retailer, since October 2021, and previously served as CEO-elect and president for Qurate Retail, Inc. beginning August 2021

- CEO of NielsenIQ (formerly Nielsen Global Connect), a global data company from February 2020 to August 2021

- Joined W.W. Grainger, Inc., an industrial supplies company in 2012 and, beginning in November 2015, served as President of the Global Online Business until February 2020

21

- Served as a White House Fellow and in appointed positions for both the George W. Bush and Barack Obama administrations

- Serves on the board of NielsonIQ, a leading consumer intelligence company

**RELEVANT SKILLS AND EXPERIENCE**

- Global e-commerce, consumer trends, consumer data, and digital business-to-business operations

- Formerly ran or oversaw compliance and cybersecurity functions or projects

- Public company CEO, strategy and business development, and audit qualified

- Government, regulatory, and climate and sustainability experience

**Defendant Wong**

63.     Defendant Wong served as a director of Discover from 2019 until the Merger. Defendant Wong also served as a member of the Board's Risk Oversight Committee. Defendant Wong has served as a member of Capital One's Board of Directors since the Merger.

64.     The 2024 Proxy Statement stated the following about Defendant Wong:

**CAREER HIGHLIGHTS**

- COO of Reddit, Inc., a community and discussion platform, since 2018, where she oversees business strategy and growth, and related teams for the company

- Previously served as president of Digital at Time, Inc. and then its COO from 2016 to 2018, where she led growth strategy and digital business transformation

- Chief business officer from 2011 to 2015 at Popsugar, Inc., a media and technology company, where she led business operations and the company's media and commerce businesses

- Held several executive management roles at AOL and worked with a range of digital media and technology clients at McKinsey & Company earlier in her career

- Serves on the board of directors of Marfeel, an ad technology platform that allows publishers to create, optimize, and monetize their mobile websites

22

**RELEVANT SKILLS AND EXPERIENCE**

- Building consumer and business digital products and platforms and understanding of digital advertising, digital ecosystems, and social media as an essential marketing tool

- Cybersecurity experience, including proactive strategy and response development and incident evaluation, management and communications strategy

- Technology, business strategy and growth development, acquisition, and brand marketing

**Relevant Non-Parties**

65.     The Second Amended Complaint filed in the Securities Class Action, captioned *KBC Asset Management NV et al v. Discover Financial Services et al*, Case No. 1:23-cv-06788, in the United States District Court Northern District of Illinois, incorporates statements from former employees ("FE") of Discover who offered their experiences as confidential witnesses. The following are the confidential witnesses whose statements are referenced throughout this complaint before this Court.

*FE 1*

66.     FE 1 worked as a principal risk compliance manager at Discover from mid-2021 until the fall of 2023. FE 1's responsibilities included building out a first-line scoping program for Discover, such as the deposits, personal loans, home loans, student loans, and card business units, in addition to broadening the remediation and restitution process following the 2020 CFPB Order. FE 1 also created a policy for the cards business with respect to credit card interchange fees.

*FE 2*

67.     FE 2 worked as a risk manager at Discover from before the Relevant Period until late 2020, and reported to Dianne Rischke ("Rischke"), the Vice President, Credit and Card Operations Risk Officer/Consumer Banking Risk Officer. Rischke managed "operations and

23

compliance risk for all banking products," and was a primary reporter to the CEO on risk management.

### FE 3

68.     FE 3 worked at Discover from before the Relevant Period until mid-2022. FE 3 led a team of student loan call center representatives and worked on the student loan restitution that was formed after the 2020 CFPB Order.

### FE 4

69.     FE 4 worked at the Company from before the Relevant Period until the fall of 2021 and was primarily involved in two of Discover's "three lines of defense" of risk management, including as a senior manager of business risk and internal controls. FE 4 reported to a director under President of Consumer Banking, Carlos Minetti's ("Minetti"), reporting structure.

### FE 5

70.     FE 5 worked at Discover from before the Relevant Period until the fall of 2021, including as a senior manager in compliance.

### FE 6

71.     FE 6 worked at Discover for more than a decade, until the summer of 2022, including serving as a director of risk management and compliance for the cards and consumer banking units during the Relevant Period. FE 6 reported to Scott Michelu, Vice President U.S. Cards Risk Officer, who reported to EVP Dan Capozzi ("Capozzi"). FE 6 had a secondary reporting relationship with Rischke, who reported to Minetti; both Capozzi and Minetti reported to Defendant Hochschild.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

24

72.     By reason of their positions as officers, directors, and/or fiduciaries of Discover, and because of their ability to control the business and corporate affairs of Discover, the Individual Defendants owed Discover and its respective shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Discover in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Discover and its shareholders so as to benefit all shareholders equally.

73.     Each director and officer of the Company owed to Discover and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Discover, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers and directors of Discover were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the respective company they served.

76.     Each of the Individual Defendants, by virtue of their position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Discover, the absence of good faith on their part, or a reckless disregard for their duties to the Company and their respective shareholders

25

that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised a majority of Discover's Board at all relevant times.

77. As senior executive officers and/or directors of publicly-traded companies whose common stocks were registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's respective business, prospects, and operations, and had a duty to cause the Company to disclose in their regulatory filings with the SEC all those facts described in this Complaint that they failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

78. To discharge their duties, the officers and directors of Discover were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Discover were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Discover's own Code of Ethics and Business Conduct (the "Code of Ethics");

26

(b)    conduct the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Discover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Discover and procedures for the reporting of the business and internal affairs to the respective boards and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Discover's operations would comply with all applicable laws and Discover's financial statements and regulatory filings filed with the SEC and disseminated to the public and the shareholders of Discover would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by Discover's officers and employees and any other reports or information that the Company were required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79. Each of the Individual Defendants further owed to Discover and their respective shareholders the duty of loyalty requiring that each favor Discover's interest and that of their respective shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

80. At all times relevant hereto, the Individual Defendants were the agents of each other and of Discover and were at all times acting within the course and scope of such agency.

81. Because of their advisory, executive, managerial, directorial, and controlling positions with Discover, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

82. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Discover.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

28

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate Discover's stock price.

85. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Discover Board, each of the Individual Defendants who was a director of Discover was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

86. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Discover and was at all times acting within the course and scope of such agency.

### DISCOVER'S CODE OF ETHICS

88. Discover's Code of Ethics stated that it "applies to all Directors, Officers, [and] employees."

29

89. In the section titled "We Are Trustworthy," under a subsection titled "Protecting Inside Information," the Code of Ethics stated:

Misuse of non-public information erodes the Company's trustworthiness and places our business and reputation at risk. While working, or providing service, on behalf of the Company, you may become aware of material, non-public information about the Company or another entity. Material, non-public information (also known as "inside information") is non-public information about the Company, our Consumers or Counterparties that may have an impact on the price of common stock or another financial instrument the Company, another company, or an investor would be likely to consider important in making an investment decision. Information becomes public when it has been effectively disclosed to the public and a reasonable waiting period has passed to allow the information to be absorbed by the marketplace.

The misuse of inside information would be considered a violation of this Code of Ethics.

90. In the section titled "We Are Transparent & Fair," under a subheading titled "How We Communicate With the Public," the Code of Ethics stated, in relevant part:

We all have a responsibility under the law to provide accurate and complete disclosure to the investing public, and to the extent that you are involved in the preparation of materials for dissemination to the public, you must ensure that the information is accurate and complete in all material respects. In particular, the Company's Senior Financial Officers, Executive Officers and Directors must endeavor to promote accurate, complete, fair, timely and understandable disclosure in the Company's public communications, including documents that the Company files with or submits to the United States Securities and Exchange Commission and other regulators.

91. In the same section, under a subheading titled "Creating & Maintaining Accurate Books & Records," the Code of Ethics stated:

Maintaining accurate and complete books and records is not only a requirement of the Company and the Code of Ethics but also vital for us to be able to measure our successes. Every business transaction undertaken by the Company must be recorded on its books accurately and in a timely manner. When providing information for these documents, you are responsible for being candid and accurate and will be held responsible for any false or misleading entries made.

In particular, Senior Financial Officers must endeavor to ensure that financial information included in the Company's books and records is correct and complete

in all material respects. All Company records should be retained or destroyed according to Company records retention policies and schedules. In accordance with these policies, in the event of litigation, audit or government or Company inquiry, you should consult with the Legal Organization regarding special record retention requirements.

92.     In the section titled "We Conduct Business Legally & Ethically," in a subheading titled "Following Both the Spirit & Letter of the Law," the Code of Ethics stated, in relevant part:

The Company is subject to numerous laws and regulations in a variety of domestic and international jurisdictions. It is your responsibility to understand the laws applicable to your job responsibilities and locations, and to comply with both the letter and the spirit of these laws. This requires that you avoid not only actual misconduct, but also the appearance of impropriety. Assume that any action you take ultimately could be publicized and consider how the Company and you would be perceived. When in doubt, stop and reflect. Ask questions. If you are unclear about the application of the law to your job responsibilities, or if you are unsure about the legality or integrity of a particular course of action, you must seek the advice of your management, the Legal Organization, Corporate Compliance, Internal Audit or Human Resources Business Risk. Any improper or illegal acts committed (or known about) during your employment at, or service to, the Company will be treated as misconduct and a violation of this Code of Ethics.

93.     In the same section, under a subheading titled "Protecting Our Consumers," the Code of Ethics stated, in relevant part:

We comply with both the letter and the spirit of fair and responsible banking laws and regulations. We are committed to adhering to the regulatory prohibition against unfair, deceptive, or abusive acts or practices and making financial products and services available to consumers and prospective consumers in a fair and consistent manner. . . . The Company maintains a fair and responsible banking program to ensure compliance with applicable laws and regulations.

94.     In the same section, under a subheading titled "Avoiding Conflicts of Interest," the Code of Ethics stated, in relevant part:

The way we conduct ourselves in business impacts our reputation and the trust we maintain with our consumers as well as each other. By recognizing and taking preemptive steps to preventing Conflicts of Interest, we are demonstrating our loyalty to our Company's integrity and our determination to "Do the Right Thing."

31

With that, you are responsible for:

- Avoiding any activities, interests or relationships that do (or may) interfere with your ability to act in the best interest of the Company,

- Not taking personal advantage of your position or authority with the Company (i.e., Approving personal lending transactions for oneself or a relative),

- Not engaging in conduct that is detrimental to the Company's interests or reputation in any way,

- Identifying and managing conflicts or potential conflicts in accordance with regulatory requirements and Company policies, and;

- Escalating all outside personal or business interests ("outside activity") which may create a conflict of interest to Employee Relations for review.

Once an outside activity has been assessed and deemed permissible, if the nature or scope of that business or your participation changes you are to re-prompt an assessment (i.e., a privately held Company becomes publicly traded or any change in ownership).

95. In a section titled "When We See Something, We Say Something," under a subheading titled "Reporting Illegal, Unethical or Improper Conduct," the Code of Ethics stated, in relevant part:

The Company's reputation for integrity depends upon you. You are the Company's first line of defense against civil or criminal liability and unethical business practices. If at any time you suspect your actions or inactions may have violated the law, this Code of Ethics, any of the Company's other policies or if you observe or become aware of any illegal, harassing/discriminatory behaviors, unethical or improper conduct by an Officer, Director, another employee, consumer, consultant, vendor, or third party relating to the Company, you are to promptly notify one of the following:

- Your Management

- Employee Relations

- Chief Legal Officer

32

- Chief Compliance Officer

- Chief Risk Officer

- Chief Audit Executive

- For Fraud, you may also email your concerns to Discovers Internal Investigation Team, internalinvestigationrequests@discover.com (mailto:internalinvestigationrequests@discover.com)

For additional direction, concerns regarding Executive Management should be reported to:

- If regarding the Chief Executive Officer, any other Senior Executive or Financial Officer, or a member of the Board of Directors:

  o Escalate concern to the Chief Audit Executive, and/or Chief Legal Officer

- If regarding the Chief Legal Officer or the Chief Audit Executive:

  o Escalate Concern to the Chairman of the DFS Board of Directors

If you feel you are unable to address or resolve a matter using any of the above options or would like to report a matter anonymously then please contact the Company's Integrity Hotline. The Integrity Hotline is a service you can access from any location - **either by phone or through the internet as outlined in the Company's Code of Conduct.**

(Emphasis in original).

96.     In the same section, under a subheading titled "Violations of the Code of Ethics,"

the Code of Ethics stated, in relevant part:

To maintain the highest standards of integrity, you must dedicate yourself to complying with the Code of Ethics (including any future amendments), Company policies, standards and procedures, and applicable laws and regulations. In addition to complying with Company policies, you are assigned to perform duties at or for the Company and expected to satisfactorily meet the requirements of your position. Failure to do so may result in the full range of corrective action available to the Company, up to and including immediate termination, as well as civil and criminal penalties (if applicable). The penalties for regulatory and criminal violations may include significant fines and imprisonment.

33

The Company reserves the right to investigate and to otherwise ensure compliance with this policy. You are expected to cooperate with personnel authorized to conduct investigations on the Company's behalf which may include requesting that you exit the work environment in order to address an alleged violation.

97. In the same section, under a subheading titled "Questions, Waivers & Amendments," the Code of Ethics stated:

Any questions regarding the Code of Ethics should be directed to the Human Resource Risk Officer or Employee Relations.

Any waivers of the provisions of the Code of Ethics for Directors or Executive Officers may be granted only in exceptional circumstances by the Board of Directors, or an authorized committee thereof, and will be promptly disclosed to the Company's shareholders if required by the rules of either the Securities and Exchange Commission or the New York Stock Exchange.

Amendments to the Code of Ethics must also be approved by the Board of Directors. It is your responsibility to be familiar with the Code of Ethics as it may be revised from time to time.

98. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes, including the Card Misclassification Misconduct, the Student Loan Misconduct, and the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

**DISCOVER'S AUDIT COMMITTEE CHARTER**

34

99. The Company also maintained an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee's primary responsibility was "oversight," with the Audit Committee Charter stating, in relevant part, that the Audit Committee's purpose was to:

- [A]ssist the Board in its oversight of

  (i) the integrity of the Company's consolidated financial statements;

  (ii) the Company's compliance with certain legal and regulatory requirements;

  (iii) the Company's system of internal controls, and disclosure controls and procedures;

  (iv) the qualifications and independence of the Company's independent registered public accounting firm ("independent auditor"); and

  (v) the performance of the Company's internal audit function and independent auditors; and

- [P]repare the report required by the Securities and Exchange Commission Regulation S-K Item 407(d)(3)(i) to be included in the Parent's annual proxy statement.

100. In a section titled "Operations," the Audit Committee Charter states, in relevant part:

3. The Committee shall make periodic reports to the Board summarizing the matters reviewed and actions taken at each Committee meeting and make available to the Board minutes of all meetings. The Committee shall review with the full Board any issues arising with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the effectiveness of internal controls, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

101. In a section titled "Authority, Duties, and Responsibilities," under a subheading titled "Oversight of the Company's Internal Auditor and Internal Controls," the Audit Committee Charter described the responsibilities of the Audit Committee, in relevant part:

14. Review and discuss with management and the internal and independent auditors internal controls over financial reporting and any report by management thereon

and any opinion of the independent auditor relating thereto. Receive reports from management regarding management's quarterly evaluations of changes in internal controls over financial reporting and discuss with management and the internal and independent auditors as appropriate. Discuss, as appropriate, the adequacy of the Company's internal controls over financial reporting with the internal and independent auditors and management including, without limitation, reports from the Chief Executive Officer or the Chief Financial Officer regarding significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting, which could adversely affect the Company's ability to record, process, summarize, and report financial data, or any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls. Review and discuss, as appropriate, any major issues as to the adequacy of the Company's internal controls over financial reporting and any special audit steps adopted in light of material control deficiencies. Review the Chief Executive Officer and Chief Financial Officer certification process and the role of the Disclosure Committee.

15. Review and approve the charter, responsibilities, budget and staffing levels of the Company's internal audit function. Review and approve the audit plan and scope of work and internal audit's overall risk-assessment methodology. Review reports of any significant changes to audit budgets and timeliness for the completion of audits.

16. Review and approve all significant aspects of internal audit outsourcing arrangements.

17. Review the results of internal audit's risk assessment, including the most significant risks facing the Company as well as how these risks have been addressed in the internal audit plan.

18. Receive reporting on audits that have been rated less than satisfactory; audit plan completion status and compliance with report issuance timeframes; audit plan changes including the rationale for significant changes; audit issue information, including aging, past-due status, root-cause analysis and thematic trends; information on higher-risk issues indicating the potential impact, root cause, remediation status and impact of such issues on the Company's risk profile; results of internal and external quality assurance reviews; information on significant industry and institution trends in risks and controls; reporting of significant changes in audit staffing levels; significant changes in internal audit processes, including aperiodic review of key internal audit policies and procedures; budgeted audit hours versus actual audit hours; information on major projects with respect to internal audit; and, at least annually, opinion on the adequacy of the risk management processes, including effectiveness of managements' self-assessment and remediation of identified issues.

19. Review and discuss with management and the internal and independent auditors findings that affect the Bank included in reports on the Company's internal controls over financial reporting and the independent auditor's attestation report regarding management's report.

102. In the same section, under a subheading titled "Oversight of the Financial Statements, Audit and Disclosure," the Audit Committee Charter described the responsibilities of the Audit Committee as, in relevant part:

20. Review the results of internal and independent audits and reviews of, and meet to review and discuss with management and the independent auditor prior to public dissemination, the Parent's annual audited consolidated financial statements and quarterly financial statements, including reviewing the Parent's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and other matters required by applicable PCAOB standards or under applicable legal, regulatory or NYSE requirements.

*** 

22. Review and discuss with the independent auditor and, to the extent appropriate, management, in connection with the Parent's Annual Report on Form 10-K, and otherwise, as appropriate, any reports of the independent auditor required by law or professional auditing standards, including reports on:

(i) all critical accounting policies and practices used in preparing the financial statements;

(ii) all alternative treatments under GAAP for policies and practices related to material items discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

(iii) any accounting adjustments that were noted or proposed by the independent auditor but were "passed"; and

(iv) other material written communications between the independent auditor and management of the Parent, such as any management or internal control letter issued or proposed to be issued, and a schedule of unadjusted differences, if any.

37

103. In the same section, under a subheading titled "Oversight of Compliance with Legal and Regulatory Requirements," the Audit Committee Charter described the responsibilities of the Audit Committee as:

29. When deemed appropriate, review with management and the independent auditor the Bank's compliance with laws and regulations and review with the Company's General Counsel, or appropriate delegates, legal, disclosure or other matters that may have a material impact on the Company's consolidated financial statements or on the Company's compliance policies.

30. Review any material reports or inquiries received from, and any reports of examination of, federal and state financial institution regulatory authorities and management's response thereto. Obtain, review and evaluate reports from management with respect to the Company's compliance with applicable legal and regulatory requirements, and the Company's Code of Ethics and Business Conduct. Discuss with management whether or not there have been any violations of such laws, regulations, or codes of conduct that could materially impact the Company's financial statements. The Company's Chief Compliance Officer shall have the authority to communicate personally to the Committee promptly on any matter involving criminal conduct or potential criminal conduct and, at least annually, shall report to the Committee on the implementation and effectiveness of the Company's compliance program. Establish procedures for:

> (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

> (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

31. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies, any external or employee complaints, including complaints regarding accounting, internal accounting controls, or auditing matters, or published reports that raise material issues regarding the Company's financial statements or accounting policies, or other material complaint matters which affect the Bank, and receive summaries of corrective action plans and timetables.

32. Review and discuss, as and when appropriate, the internal auditor's review of perquisites, expenses and conflicts of interest, if any, of members of the Company's management and senior management of the business units. Review disclosures of insider and affiliated party transactions.

38

33. Provide the report of the Committee as required by the SEC for inclusion in the Parent's annual proxy statement.

34. Receive reporting on annual FDICIA and Call Report processes.

35. Satisfy itself that the audit procedures employed by the internal and independent auditors shall meet the requirements of the FDIC regulations.

36. Review and discuss any reports concerning material violations submitted to the Committee by Company attorneys or outside counsel pursuant to the SEC attorney professional responsibility rules or otherwise.

104. In same section, under a subheading titled "Oversight of the Company's Risk Management," the Audit Committee Charter described the responsibilities of the Audit Committee as:

37. Notwithstanding the Board's allocation of oversight responsibilities of risks and risk management to the Risk Oversight Committee, the Committee shall discuss policies with respect to risk assessment and management.

38. Receive and review reports from the Chief Risk Officer and other members of management as the Committee deems appropriate on the guidelines and policies for assessing and managing the Company's exposure to risks, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

The Committee (which may act through the Chair of the Committee) shall share information and liaise and meet in joint session with the Risk Oversight Committee as necessary or desirable to help ensure that the committees have received the information necessary to permit them to fulfill their duties and responsibilities with respect to oversight of risk management matters.

105. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Card Misclassification Misconduct, the Student Loan Misconduct, and in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the

39

Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Discover's Structure and Business*

106. Discover was a "digital banking and payment services company" incorporated in Delaware. Discover's operating model was broken into two segments: (1) digital banking, which included consumer banking and lending products, and (2) payment services, which provided payment transaction processing and settlement services. During the Relevant Period, Discover operated a nationwide consumer banking business that included credit cards, private student loans, personal loans, home loans, deposit products, and payment-processing services.

107. Discover, a banking holding company under the Bank Holding Company Act of 1956, and a financial holding company under the Gramm-Leach-Billey Act, was subject to extensive oversight by the FDIC, CFPB, Federal Reserve, and other federal regulators. As such, Discover was heavily regulated and required to abide by applicable laws and regulations. Discover established various policies and standards to govern potential risks, such as credit, market, liquidity, operational, compliance, reputation, and strategic risks.

108. As such, Discover maintained an enterprise risk management framework that purportedly operated through a "three lines of defense" model, consisting of business-unit management, compliance and risk-management functions, and internal audit.

109. Capital One is a Delaware corporation that operates as a "global payments provider" and financial institution. In addition to offering credit and debit cards, Capital One offers bank lending, treasury management, personal loans, auto loans, and other consumer lending products. Capital One's total net revenue is primarily derived from lending to consumer and commercial customers.

110. As a banking organization, Capital One is also subject to heavy regulation and supervision by applicable laws, including regulations by the Federal Reserve, the Office of the Comptroller of the Currency, the FDIC, and the CFPB.

111. On January 6, 2025, Discover and Capital One filed a joint proxy statement with the SEC detailing the proposed acquisition of Discover by Capital One, which was completed on May 18, 2025. Under the merger agreement, Discover was acquired by Capital One, with Capital One as the surviving corporation. Accordingly, Capital One became the parent company of Discover and thus must ensure corporate governance procedures are enforced, and the Individual Defendants are held accountable for misconduct.

### *Industry Internal Control Standards*

112. The concepts of risk management and compliance are embodied in the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Specifically, the COSO's mission is to "help organizations improve performance by developing thought leadership that enhances internal control, risk management, governance, and fraud deterrence."[2]

---

[2] https://www.coso.org/about-us.

113. The COSO has promulgated widely adopted principles for compliance and risk management. For example, the COSO defines "compliance risks" as "those risks relating to possible violations of applicable laws, regulations, contractual terms, standards, or internal policies where such violation could result in direct or indirect financial liability, civil or criminal penalties, regulatory sanctions, or other negative effects for the organization or its personnel."[3]

114. According to the FDIC, financial institutions "must develop and maintain a sound compliance management system that is integrated into the overall risk management strategy of the institution," which typically consists of (1) board and management oversight; (2) the implementation of a compliance program; and (3) ensuring that the program works through regular compliance audits. Failure to comply with federal consumer protection laws and regulations "can result in monetary penalties, litigation, and formal enforcement actions."[4]

115. In implementing such a system, the Federal Reserve Board directs that "senior management be fully involved in the activities of their institutions and possess sufficient knowledge of all major business lines to ensure that appropriate policies, controls, and risk monitoring systems are in place and that accountability and lines of authority are clearly delineated."[5]

116. In particular, a financial services company's compliance regime should include robust internal control over financial reporting ("ICFR"), which is a "process designed by, or under

---

[3] COSO, Compliance Risk Management: Applying the COSO ERM Framework, at 1, https://www.fdic.gov/news/financial-institution-letters/2006/2cep_compliance.pdf.
[4] FDIC, Compliance Management System, at 1.
[5] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, SR 95-51 (SUP), Rating the Adequacy of Risk Management Processes and Internal Controls at State Member Banks and Bank Holding Companies, Nov. 14, 1995 (rev. Feb. 26, 2021) ("Fed Board SR 95-51 (SUP)"), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

the supervision of the issuer's principal executives and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel" in order to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."[6]

117. This framework classifies failures of ICFR as (1) deficiencies, (2) significant deficiencies, and (3) material weaknesses. A deficiency indicates that "the design or operation of a control does not allow management or employees . . . to prevent or detect misstatements" timely.[7] Significant deficiencies are "less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting."[8] Finally, a material weakness, which is the most severe category of ICFR failure, is a "deficiency, or a combination of deficiencies, in [ICFR], such that there is a reasonable possibility that a material misstatement of the company's annual or interim statements will not be prevented or detected on a timely basis."[9]

118. Discover has acknowledged the importance of implementing and maintaining effective risk management and compliance systems, and as such represents that its "enterprise risk management philosophy" was reflected through five key principles: Comprehensiveness, Accountability, Independence, Defined Risk Appetite, and Transparency. Specifically, the Company maintained a risk management framework consisting of a "three lines of defense model."

---

[6] *See* SEC Rules 13a-15(f) and 15d-15(f).
[7] Public Company Accounting Oversight Board ("PCAOB"), AS [Auditing Standard] 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, App'x A - Definitions, https://pcaobus.org/oversight/standards/auditingstandards/details/AS2201.
[8] *Id.*
[9] *Id.*

119. First, the Company's business units "seek to achieve business objectives while identifying and managing risks that arise from day-to-day operations as well as those driven by change."

120. Second, the Company's corporate risk management ("CRM") department (1) oversees the implementation of company-wide risk management policies and standards; (2) oversees "the processes that are designed to be consistent with the size and complexity" of Discover, industry practices, and applicable regulations; and (3) tests the business units' compliance with applicable regulations.

121. Third, the Company's internal audit department "performs periodic, independent reviews and tests compliance with risk management policies, procedures and standards across [the] Company," and "periodically reviews the design and operating effectiveness of our risk management program and processes," including "the independence and effectiveness of our CRM function."

122. Further, the Company previously represented that its CEO "is ultimately responsible for risk management," and had the responsibility to establish "a risk management culture throughout [the] Company" to ensure "that businesses operate in accordance with this risk culture."

### The Card Misclassification Misconduct

123. By way of background, credit card transactions involve (1) the cardholder, (2) the merchant, (3) the acquiring bank, which pays transaction funds to merchants, (4) the card processor, which works with the acquiring bank to process transactions, (5) the cardholder's issuing bank, and (6) the card network.

124. Credit card transactions require a cardholder to make a transaction, which is processed by the merchant and sent to the card processor, who in turn submits the transaction to the card network. Discover serves as both the issuing bank and the card network because it issues credit cards directly to consumers. Therefore, as the card network, the Company sets the interchange fee amounts that are charged to merchants. The amount of Discover's interchange fees depends on the category of the cardholder; typically, interchange fees for "commercial" credit cards were higher than those set for "consumer" credit cards.

125. Beginning no later than 2007, Discover improperly misclassified millions of consumer credit cards, or those intended for ordinary consumer spending, as commercial credit cards for purposes of interchange pricing. As a result of these misclassifications, merchants were charged commercial interchange rates on transactions involving consumer credit cards for the purpose of increasing revenues.

126. Discover did not disclose to the merchants that it was charging these higher commercial interchange fees. The improper classifications remained in place for more than fifteen years. Consequently, Discover had misclassified approximately five million consumer credit cards as "commercial," causing merchant customers to suffer monetary harm of approximately one billion dollars.

127. Due to Discover's lack of proper internal controls "designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers," the Company continued to improperly misclassify credit cards, leading to "inaccurate revenue recognition[.]"

128. Further, according to FE 1, Discover had not created a policy for the cards business unit addressing the card misclassifications until September 2023. This policy provided that, in

accordance with a network agreement, accounts needed to be classified properly, meaning employees were required to consult the network agreement for further information on classifications and interchange rates.

### The Student Loan Servicing Misconduct

129. On September 17, 2010, Discover became the loan servicer for over 800,000 private student loan accounts with a total balance of approximately $4.2 billion, after acquiring Citigroup's student loan division for $600 million. Consequently, Discover was responsible for performing basic loan services for borrowers, including, *inter alia*, providing amounts due through account statements, providing tax information, such as Form 1098-E, and contacting borrowers regarding past-due payments.

130. In particular, during the Relevant Period, Discover originated, serviced, collected, and administered private student loans throughout the United States. Discover's student loan operations were subject to federal consumer protection laws governing borrower communications, loan servicing, collections practices, disclosures, and account administration. Discover serviced loans affecting tens of thousands of borrowers nationwide.

131. In 2015, the CFPB issued the 2015 CFPB Order against Discover concerning its student loan servicing operations. The CFPB found that Discover failed to faithfully and properly execute its duties as a student loan servicer, subsequently harming thousands of borrowers. Specifically, Discover (1) engaged in deceptive and unfair practices involving tax information provided to student loan borrowers, such as improperly refusing to send borrowers Form 1098-E statements, (2) overstated minimum payments due on loans approaching or in repayment, (3) engaged in improper and illegal debt collection techniques, such as calling thousands of borrowers

46

during prohibited hours, sometimes dozens of times, and (4) violated the Fair Debt Collections Act by failing to provide required information relating to written off loans.

132. Pursuant to the 2015 CFPB Order, Discover agreed to provide approximately $16 million in consumer refunds and pay a $2.5 million civil penalty. Further, Discover agreed to implement corrective measures relating to billing, collections, tax reporting, compliance monitoring, and servicing operations.

133. Following the 2015 CFPB Order, Discover continuously failed to comply with the agency's directives by engaging in improper loan servicing practices. Thereafter, in December 2020, the CFPB issued the 2020 CFPB Order addressing Discover's continued misconduct.

134. The CFPB found that Discover not only failed to rectify the issues identified in the 2015 CFPB Order, but also Discover engaged in *additional* misconduct since the first order. Discover's additional misconduct included (1) "misrepresent[ing] to more than 100,000 consumers about the minimum periodic payment" consumers owed, (2) "misrepresent[ing] to more than 8,000 consumers" the interest amount owed on their student loans, and (3) "misrepresent[ing] [to more than 390,000 consumers] multiple other facts material to the terms and servicing of consumers' student loans." These material facts included amounts of interest owed, applicable interest rates, how payments were allocated, due dates, loan amounts due, whether payments were past due, other repayment information, and the availability of rewards and discounts.

135. Further, the 2020 CFPB Order found that Discover improperly withdrew automatic payments from over 17,000 borrowers' bank accounts and cancelled or failed to withdraw automatic payments from 14,000 borrowers, resulting in improper excess interest payments or delinquency status placements.

47

136.    As a result, the CFPB required Discover to pay $10 million in consumer redress and $25 million in civil penalty. The 2020 CFPB Order required Discover to (1) consider compliance with future student loan servicing initiatives, (2) accurately represent loan information to borrowers, and (3) refrain from withdrawing or failing to withdraw payments without proper authorization and notice.

137.    Despite multiple consent orders, Discover continued to experience issues with risk management and compliance. FE 1 detailed understaffing for student loan remediation efforts, which led to, as FE 3 described, a backlog of 400 "outstanding issues" within Discover's student loan business that needed to go through "restitution and redress." Further, FE 3 reasoned that Discover's student loan business issues persisted for so long because there were "a lot of problems committing to one plan and executing a plan without changing it a million times." FE 2 also noted that the managers responsible for the student loan business "didn't know the regulations that applied to student loans."

138.    On November 29, 2023, Discover announced that it was selling its student lending business. Later, on December 5, 2023, during a call with analysts, Defendant Greene admitted that the reason Discover sold its student lending business was because of "***perennial issues in our ability to service that portfolio***" and because Discover's "***internal systems capabilities weren't on par with what a professional servicing organization could do.***"

### *Discover's Internal Control Failures*

139.    Despite Discover's purported commitment to effective risk management through its three lines of defense, Discover experienced internal control failures, which ultimately led to the continuation of its Card Misclassification Misconduct and Student Loan Misconduct.

48

140. For example, in 2021, the FDIC issued 2021 ROE, finding that Discover "recklessly engaged in unsafe or unsound banking practices" by, *inter alia*, "failing to establish and maintain" an effective CMS; and also violated consumer protection statutes and regulations. The 2021 ROE was based on "the findings of the FDIC's October 18, 2021 examination along with [CFPB] findings during the review period for the 2021 ROE, and the findings of subsequent FDIC visitations, targeted reviews, and monitoring." The 2021 ROE ultimately led to the issuance of the subsequent FDIC Consent Orders.

141. Notably, while the Company did not "admit[ ] or deny[ ] any charges of unsafe or unsound banking practices or violations of law or regulation," Discover nonetheless "consented to the issuance of" the FDIC Consent Orders.

142. Consequently, in September 2023, the FDIC issued the 2023 Consent Order, which it later amended on April 16, 2025 (the "2025 Consent Order Update") to include "an Order of Restitution[] and an Order to Pay," finding that Discover "fail[ed] to establish and maintain a [CMS] providing for compliance with all applicable consumer protections laws and implementing regulations, including:"

> (a) board of directors (Board) and Bank management oversight and commitment, change management, comprehension, identification, and management of risk, corrective action and self-identification, and third party risk management; and (b) written policies, procedures, standards, and/or processes (collectively, Procedures), training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of Consumer Protection Laws and Regulations and associated consumer harm with internal controls and information systems and audit systems appropriate to the size of the Bank and the nature, scope and risk of its activities, whether conducted by the Bank or on behalf of the Bank through Third-Party Relationships.

143. The FDIC also found that the Company violated, *inter alia*, Section 5 of the FTCA; the Truth-in-Lending Act, 15 U.S.C. § 1601, et seq.; the Servicemembers Civil Relief Act, 50

U.S.C. § 501, et seq.; and the Electronic Records and Signatures in Commerce Act, 5 U.S.C. § 7001, et seq.; as well as related implementing regulations.

144. Accordingly, the FDIC ordered that Discover's Board must, *inter alia*, (1) "eliminate or correct, and prevent the unsafe or unsound banking practices and the violations of law or regulation identified in the 2021 ROE"; (2) "appropriately address the instances of consumer harm and the deficiencies and weaknesses identified in the 2021 ROE in a timely manner"; and (3) fully comply with the provisions of [the 2023 Order.]" In addition, the FDIC required Discover's Board to, "at a minimum," take the following measures:

1. set and clearly communicate expectations regarding ethics and compliance with Consumer Protection Laws and Regulations for the Board, Bank management, staff, and any person associated with a business arrangement between the Bank and another entity, by contract or otherwise, [including third parties];

2. ensure that the Bank establishes and maintains a proactive, effective risk-based ERM Framework, CC Program and CVM Program;

3. ensure that the Bank maintains one or more compliance officers with appropriate experience and expertise and sufficient authority, independence, and suitable resources, both staffing and systems, to enable them to satisfactorily oversee the implementation of the CC Program and the CVM Program and assure the Bank's compliance with Consumer Protection Laws and Regulations;

4. ensure adequate information systems and Procedures are in place to provide the Board with timely, relevant and accurate information regarding risks related to potential and identified violations of Consumer Protection Laws and Regulations and incidents that may involve consumer harm in a consistent and readily understandable format at regular intervals and enable it to act on such reporting;

5. engage in robust consumer compliance-related discussions as part of all full Board and appropriate Board committee meetings, [as well as] comprehensively and accurately document those discussions in meeting minutes;

6. set clear and measurable expectations for Bank management regarding their (a) ethics and commitment to compliance with Consumer Protection Laws and Regulations; (b) leadership across business lines and operations; (c) sound and consistent management of the Bank's ERM Framework, CC Program and CVM Program; (d) oversight and monitoring of Third-Party Relationships providing products, services, and/or conducting other activities either to, through, or on behalf

of the Bank, for compliance with Consumer Protection Laws and Regulations; and (e) managing consumer compliance risks to stay within the Board's risk appetite parameters and established risk limits, and establish and maintain Procedures to monitor and regularly evaluate Bank management's adherence to these Board expectations;

7. have and maintain Procedures to monitor and regularly evaluate the adherence to and effectiveness of the Bank's ERM Framework, CC Program and CVM Program," and "ensure appropriate revisions are timely made . . . to assure on-going compliance with Consumer Protection Laws and Regulations;

8. ensure the Bank's internal audit function (Internal Audit) (a) is appropriate to the size of the Bank and the nature and scope of Bank Activities; (b) appropriately considers available risk assessments, studies, reports, including regulatory findings, plans, and/or Procedures related to the Bank's compliance with Consumer Protection Laws and Regulations; and (c) appropriately assesses the Bank's implementation of and adherence to the Bank's ERM Framework, CC Program, CVM Program and any other Procedures adopted by the Board related to compliance with Consumer Protection Laws and Regulations and any revisions to them; [and]

9. have and maintain Procedures to track actions to (a) eliminate or correct any unsafe or unsound banking practices identified and violations of law or regulation cited in reports of examination, visitation reports or supervisory letters; (b) appropriately address any instances of consumer harm and/or any deficiencies or weaknesses identified in future reports of examination, visitation reports or supervisory letters; and (c) appropriately address non-compliance with Consumer Protection Laws and Regulations and corrective and preventive action for identified deficiencies and weaknesses in the Bank's ERM Framework, CC Program and/or CVM Program to ensure such corrective actions are implemented in a timely manner and thereafter monitor implementation of and adherence to resulting revisions.

145. However, Discover failed to design, implement, and properly maintain a robust CMS, particularly with respect to ICFR, which resulted in various material weaknesses, allowing Discover to continue in its engagement of the Card Misclassification Misconduct and the Student Loan Misconduct.

146. For example, according to FE 1, a former principal risk compliance manager responsible for compliance-related matters, Discover had a "genuinely terrible compliance situation" and "there was a culture of non-compliance."

147. According to FE 6, a former director of risk management and compliance, Discover failed to create proper internal controls, describing Discover's culture of risk and compliance in its cards business as the "wild west." FE 6 detailed that Discover did not assess the Company's business processes to identify potential control gaps, which is critical to addressing pertinent errors, such as the credit card misclassifications.

148. According to FE 4, the first line of defense team ("first-line") only tested whether controls happened, not whether they were effective. Specifically, FE 4 sated that the "the compliance structure lacked the right roles and responsibilities" and Discover "lacked the right leadership to instill effective compliance and controls."

149. Further, FE 1 noted that the first-line experienced internal tensions which resulted in a "hostile work environment" and miscommunications. FE 1 also detailed inconsistencies in who the first-line reported to. For instance, one first-line team, the scoping team, reported to first-line management, and the other first-line team, the testing team, reported to the second-line of defense ("second-line") management, resulting in the second-line only confirming that a particular procedure existed, but not whether there were gaps in the procedure.

150. FE 6 recounted that the first-line team reporting to the second-line term allowed the first-line team to reject testing plans FE 6's teams were trying to implement.

151. FE 1 also detailed how despite there being a common industry practice where the first line performs "process" testing, such as deposit process, and the second-line performs regulatory testing, this structure was flipped at Discover. FE 1 stated that they complained "incessantly" about this.

152. FE 1 added that "CSTs," which were laypeople interpretations of regulations, were incomplete and did not have all the control standards that applied to a particular regulation, which

caused the scoping team to check the regulations themselves. This caused delays on the scoping team, as the unit only had just four to eight employees at one point.

153. Further, according to FE 1 and FE 6, certain business unit executives refused to sign off on first-line compliance reports until certain findings were removed or findings were downgraded to observations.

154. FE 6 also stated that Discover's "reviewing processes" lacked necessary steps to identify control gaps, as the system did not have the ability to "map out" Discover's business processes and assess whether there were adequate controls related to them. FE 6 stated that Brian Hughes, who later became the Company's Chief Risk Officer, told FE 6 that it was "too much work" to update the Company's systems to allow for mapping and reviewing control gaps.

155. Additionally, Discover's compliance department was critically understaffed, despite Discover's representations to investors about significant investments into compliance. According to FE 1 and FE 4, the Company's first-line team was chronically understaffed, and Discover was "significantly under-resourced" in compliance, resulting in overworked employees, high turnover rates, regular delays in compliance testing, and unqualified candidates. FE 1 stated that despite Discover increasing the size of the first-line group, the new members were "just internal transfers who did not have any experience in compliance."

156. FE 4 and FE 6 noted that the Company lacked employees with adequate compliance experience. For example, FE 6 stated that "They literally gave me call center agents to do compliance testing." FE 6 elaborated that call center agents were working in first-line testing for the consumer banking business, noting that the agents were evaluating business processes and determining whether the Company was meeting its regulatory requirements.

53

157.    FE 1 added that there were numerous delays in testing. For example, FE 1 noted that testing that should have only taken three to five months took up to in the range of eight, nine, or ten months. FE 1 further stated that the testing team would frequently cancel planned tests due to understaffing.

158.    FE 1 also detailed that for a period of time, Discover had more than 250 open regulatory findings, and months prior there were more than 300. FE 1 stated that this caused Capozzi to "freak[]" out" and FE 1 observed Capozzi "yelling at people in meetings" about the number of findings.

### *Discover Attempted to Improve its Compliance Efforts But Failed to Rectify Key Issues*

159.    In 2020, Discover initiated a project called "Project Operational Excellence," intended to rectify the Company's lacking compliance controls. Project Operational Excellence included the following steps: (1) defining Discover's various business processes and specifying minimum requirements to manage a process, define the associated job aids, mapping out systems used, and determine other procedures, (2) identifying the risks associated with the process, (3) assessing what steps Discover must take to ensure compliance, and (4) evaluating the controls for the process.

160.    FE 4 stated that the Company had identified control gaps but had no plan on resolving the issues. Specifically, FE 4 stated that "It was more like we have all these gaps. What are we going to do with all this information?" FE 4 elaborated stating that the project had gone "way off the rails" and that the Company did not address "he bigger scope of what do we expect of a compliance program for a control environment."

### FALSE AND MISLEADING STATEMENTS

*February 20, 2019 10-K*

54

161. On February 20, 2019, the Company filed the 2018 10-K. The 2018 10-K was signed by Defendants Hochschild, Graf, Bush, Duncan, Eazor, Glassman, Maheras, and Moskow. The 2018 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hochschild and Graf attesting to the accuracy of the 2018 10-K, certifying that the 2018 10-K "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" Specifically, Defendants Hochschild and Graf certified that:

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and have:
>
> ***
>
> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> ***
>
> d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]
>
> ***
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]

162. The 2018 10-K addressed transaction fee amounts in its "Discount and Interchange Revenue" section, stating: "Contractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement."

163. The 2018 10-K also expressed confidence when providing information regarding Discover's risk management standards and policies:

The CRM department sets risk management standards and policies that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements.

\*\*\*

Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

\*\*\*

Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.

### October 23, 2019 Code of Ethics

164. On October 23, 2019, Discover publicly dispersed its updated Code of Ethics, which it frequently referenced in its SEC filings, on its website, and in other Company documents, stating that "[t]he Company complies with both the letter and the spirit of fair and responsible banking laws."

### February 26, 2020 10-K

165. On February 26, 2020, the Company filed with the SEC on Form 10-K its yearly financial and operational results for 2019 (the "2019 10-K"). The 2019 10-K was signed by

56

Defendants Hochschild, Greene, Bush, Duncan, Eazor, Glassman, Maheras, Moskow, and Wong. The 2019 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 2019 10-K, certifying that the 2019 10-K "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" Specifically, Defendants Hochschild and Greene certified that:

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and have:

\*\*\*

a. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

\*\*\*

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

\*\*\*

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]

166. The 2019 10-K addressed transaction fee amounts in its "Discount and Interchange Revenue" section, stating: "Contractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement."

167. The 2019 10-K also expressed confidence when providing information regarding Discover's risk management standards and policies:

The CRM department sets risk management standards and policies that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements.

\*\*\*

Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

\*\*\*

Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.

***October 22, 2020 Earnings Call***

168. On October 22, 2020, the Company held an earnings conference call with investors and analysts to discuss Discover's financial and operational results for the third quarter of 2020 (the "3Q 2020 Earnings Call").

169. During the 3Q 2020 Earnings Call, an analyst noted concern among investors regarding negative operating leverage due to years of "chronic underinvestment," to which Defendant Hochschild responded:

So first, having been here for over 20 years, ***I have to maybe disagree with the phrase chronic underinvestment. I think our investments have been appropriate.*** But at the beginning of the year, we saw an opportunity to invest more. And so I would characterize it that way.

***February 17, 2021 10-K***

58

170. On February 17, 2021, the Company filed with the SEC on Form 10-K its yearly financial and operational results for 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Hochschild, Greene, Maheras, Bush, Duncan, Eazor, Glassman, Moskow, and Wong. The 2020 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 2020 10-K, certifying that the 2020 10-K "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" Specifically, Defendants Hochschild and Greene certified that:

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and have:

\*\*\*

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

\*\*\*

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

\*\*\*

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

59

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]

171.  The 2020 10-K addressed transaction fee amounts in its "Discount and Interchange Revenue" section, stating: "Contractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement."

172.  The 2020 10-K also expressed confidence when providing information regarding Discover's risk management standards and policies:

The CRM department oversees the establishment of enterprise-level risk management standards and policies and designs processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements.

\*\*\*

Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

\*\*\*

Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.

173.  The statements in paragraphs ¶¶160-171 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card

Misclassification Misconduct to continue for the Relevant Period; (3) as a result of the foregoing, Discover overcharged customers; and (4) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, the Individual Defendants caused the Company's statements to be materially false and misleading at all relevant times.

***February 25, 2021 22nd Annual Crédit Suisse Virtual Financial Services Forum***

174. On February 25, 2021, Defendant Greene virtually attended the 22nd Annual Crédit Suisse Virtual Financial Services Forum. During the forum, Defendant Greene was asked about Discover's guidance on 2021 expenses and his understanding of Discover's operating efficiency and its evolution, as well as how investors should think about it going forward. Defendant Greene stated:

> [W]hat we are going to do is manage the business efficiently. ***And so by that, I mean, is a real focus on corporate cost and those dollars that aren't directly attributable to our ability to grow or our ability to grow in a compliant way. So we're a regulated financial services institution. We're going to put money into risk and compliance as we want to.***

175. The statement in paragraph ¶173 was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's lack of regulatory compliance resulted in Discover improperly executing its duties as a student loan servicer by engaging in deceptive and unfair practices; and (2) Discover's compliance and internal control failures were significant, as demonstrated by the 2015 CFPB Order and the 2020 CFPB Order, which addressed Discover's student loan servicing misconduct and credit card misclassification misconduct.

*February 24, 2022 10-K*

176.    On February 24, 2022, the Company filed with the SEC on Form 10-K its yearly financial and operational results for 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Hochschild, Greene, Maheras, Bush, Duncan, Eazor, Glassman, Moskow, Rawlinson, and Wong. The 2021 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 2021 10-K, certifying that the 2021 10-K "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" Specifically, Defendants Hochschild and Greene certified that:

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and have:
>
> ***
>
> b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> ***
>
> d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]
>
> ***
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]

177. The 2021 10-K addressed transaction fee amounts in its "Discount and Interchange Revenue" section, stating: "Contractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement."

178. The 2021 10-K also expressed confidence when providing information regarding Discover's risk management standards and policies:

The CRM department (i) oversees the establishment of enterprise-level risk management standards and policies; (ii) oversees the processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements; and (iii) independently test business units' compliance with applicable regulatory requirements.

\*\*\*

Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

\*\*\*

Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.

*April 28, 2022 10-Q*

179. On April 28, 2022, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended March 31, 2022 (the "1Q 2022 10-Q"). The 1Q 2022 10-Q was signed by Defendant Greene and included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and

63

Greene attesting to the accuracy of the 1Q 2022 10-Q. Further, Defendants Hochschild and Greene certified that:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

180.     In its "Basis of Presentation" section, the 1Q 2022 10-Q addressed Discover's compliance with Generally Accepted Accounting Principles ("GAAP"), stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

181.     The statements in paragraphs ¶¶175-179 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; and (5) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a

64

result of the foregoing, the Individual Defendants caused the Company's statements to be materially false and misleading at all relevant times.

### *May 19, 2022 Annual Shareholders Meeting*

182.    On May 19, 2022, the Company held its Annual Shareholders Meeting where Defendant Hochschild emphasized Discover's various goals for 2022, stating: "Top of the list is our focus on compliance first, which means *we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank.*"

183.    The statement in paragraph ¶181 was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result, Discover overcharged customers; (4) Discover improperly executed its duties as a student loan servicer by engaging in deceptive and unfair practices, and thus violated regulations on student lending, as stated in the 2015 and 2020 CFPB Orders; and (5) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, the Individual Defendants caused the Company's statements to be materially false and misleading at all relevant times.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**

### *July 20, 2022 Financial Reports*

184. On July 20, 2022, the truth began to emerge when Discover issued the July 2022 Press Release, which disclosed an internal investigation into its student loan servicing practices and related compliance issues, stating that the Company was suspending its share repurchase program. The Company stated in a press release:

> During the second quarter of 2022, the company repurchased approximately 5.8 million shares of common stock for $601 million. Shares of common stock outstanding declined by 2.0% from the prior quarter. The company is suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters. The investigation is ongoing and is being conducted by a board-appointed independent special committee.

185. Additionally, during Discover's 2Q 2022 earnings call later that day, it was revealed that the issues detailed in the CFPB Consent Orders were related to the Student Loan Misconduct, encompassed by the internal investigation:

> [Analyst]: [I]n the public, we know that there's also a consent order related to this with the CFPB, it looks like in 2020, and I believe it's even tied to a consent order for 2015. Did that . . . influence the [share buyback] suspension? And was there something new that develop[ed] that caused the internal investigation?
>
> [Defendant Hochschild]: I guess the only thing I can say is both the consent order and the investigation are in the area of student loan servicing. But beyond that, there really isn't anything else I can add at this time.

186. On this news, the price per share of Discover's stock fell $9.80, or 8.9%, from a closing price of $109.80 per share on July 20, 2022, to close at $100.00 per share on July 21, 2022. However, the Individual Defendants continued to conceal the full truth regarding the Company's regulatory compliance and the true extent of the Card Misclassification Misconduct and the Student Loan Misconduct.

### *July 27, 2022 10-Q*

187. For example, on July 27, 2022, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended June 30, 2022 (the "2Q 2022 10-

Q"). The 2Q 2022 10-Q was signed by Defendant Greene and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 2Q 2022 10-Q. Further, Defendants Hochschild and Greene certified that:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

188.    In its "Basis of Presentation" section, the 2Q 2022 10-Q addressed Discover's compliance with GAAP, stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

### *October 27, 2022 10-Q*

189.    Also, on October 27, 2022, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended September 30, 2022 (the "3Q 2022 10-Q"). The 3Q 2022 10-Q was signed by Defendant Greene and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 3Q 2022 10-Q. Further, Defendants Hochschild and Greene certified that:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

190. In its "Basis of Presentation" section, the 3Q 2022 10-Q addressed Discover's compliance with GAAP, stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

191. The statements in paragraphs ¶¶186-189 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result of the foregoing, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; and (5) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm.

### February 14, 2023 Crédit Suisse 24th Annual Financial Services Forum

192. On February 14, 2023, Defendant Greene attended the 24th Annual Crédit Suisse Financial Services Forum. During the conference, Defendant Greene was asked about targeted

68

capital levels and their evolution, given Discover's pause on repurchases in 2022, to which Defendant Greene replied:

> Yes, so, what we've historically said is we would—we had a target of 10.5% and we've been persistently higher than that. In 2022, we put forward a really, really robust plan in terms of return of capital. We are executing on that very, very well, and then we had to pause at the end of the second quarter into the third quarter. ***Fortunately, we got that behind us.*** At the end of the year, I believe we had $2.8 billion remaining on our authorization, and the plan is to execute on that authorization in the first quarter of '23 and into the second quarter of '23. Then, we'll share a proposal with our Board. The expectation is that we'll continue to maintain our capital allocation priorities. So first, investment in organic growth; second, return excess capital to shareholders; and then third, if there's some sort of bolt-on M&A, we'll look at it. But no major changes in the priorities.

193. The statement in paragraph ¶191 was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Discover improperly executed its duties as a student loan servicer by engaging in deceptive and unfair practices, as noted in the 2015 and 2020 CFPB Orders; (2) Discover's repurchase suspension in July 2022 was tied to its Student Loan Misconduct; and (3) the issues resulting from the Student Loan Misconduct was ongoing, as the Company was still remedying its compliance failures, as per the 2020 CFPB Order.

### February 23, 2023 10-K

194. On February 23, 2023, the Company filed with the SEC on Form 10-K its yearly financial and operational results for 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Hochschild, Greene, Maheras, Bush, Duncan, Eazor, Glassman, Moskow, Owen, Rawlinson, and Wong. The 2022 10-K also attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene

attesting to the accuracy of the 2022 10-K. Specifically, Defendants Hochschild and Greene certified that:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the registrant and have:

\*\*\*

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

\*\*\*

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

\*\*\*

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]

195.    The 2022 10-K addressed transaction fee amounts in its "Discount and Interchange Revenue" section, stating: "Contractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement."

196.    The 2022 10-K also expressed confidence when providing information regarding Discover's risk management standards and policies:

> The CRM department (i) oversees the establishment of enterprise-level risk management standards and policies; (ii) oversees the processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements; and (iii) independently test business units' compliance with applicable regulatory requirements.

***

> Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

***

> Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.

197.    In its "Basis of Presentation" section, the 2022 10-K detailed Discover's compliance with GAAP, stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

### March 29, 2023 Annual Report for 2022

198.    Later, on March 29, 2023, Discover issued its 2022 Annual Report, where Defendant Hochschild emphasized Discover's focus on compliance, noting "three key areas" Discover strengthened its CMS, including:

Strong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, effective processes that we regularly monitor and test to be certain they are working as designed.

Identifying and solving problems before customer harm happens, or when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again.

### *April 25, 2023 10-Q*

199.    On April 25, 2023, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended March 31, 2023 (the "1Q 2023 10-Q"). The 1Q 2023 10-Q was signed by Defendant Greene and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 1Q 2023 10-Q. Further, Defendants Hochschild and Greene certified that:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

200.    In its "Basis of Presentation" section, the 1Q 2023 10-Q addressed Discover's compliance with GAAP, stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

201.    The statements in paragraphs ¶¶193-199 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused

72

the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; and (5) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm.

### *July 19, 2023 Press Release*

202. The truth continued to emerge when, on July 19, 2023, Discover published the 2Q 2023 Press Release, which addressed the Company's Card Misclassification Misconduct:

> Beginning around mid-2007, Discover incorrectly classified certain credit card accounts into our highest merchant and merchant acquirer pricing tier.

> \*\*\*

> As of June 30, 2023, the Company's consolidated financial statements reflect a liability of $365 million within accrued expenses and other liabilities to provide refunds to merchants and merchant acquirers as a result of the card product misclassification.

> \*\*\*

> An investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing. Discover is in discussions with its regulators regarding this matter and corporate governance and risk management . . . [T]he Company received a proposed consent order from the FDIC in connection with consumer compliance. [The FDIC order] does not include the card product classification matter. Additional supervisory actions could occur.

> \*\*\*

73

The Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending.

### July 20, 2023 Earnings Call

203. Further, on July 20, 2023, Discover held an earnings call to discuss the Company's second quarter 2023 financial results (the "2Q 2023 Earnings Call"). During the 2Q 2023 Earnings Call, Defendant Hochschild stated that there was a "link between" the 2020 CFPB Order and "the broader focus on our compliance management system." In response to a question about compliance, Defendant Hochschild admitted that Discover had "underinvested" in compliance, stating, "I do believe we *underinvested and that's something I take accountability for.*"

204. On this news, the price per share of Discover's stock fell $19.40, or 15.9%, from a closing price of $121.85 per share on July 19, 2023, to close at $102.45 per share on July 20, 2023. However, the Individual Defendants continued to conceal the full truth regarding the Company's regulatory compliance and the true extent of the Card Misclassification Misconduct and the Student Loan Misconduct.

### July 28, 2023 10-Q

205. For example, on July 28, 2023, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended June 30, 2023 (the "2Q 2023 10-Q"). The 2Q 2023 10-Q was signed by Defendant Greene and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the 2Q 2023 10-Q. Further, Defendants Hochschild and Greene certified that:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

206. In its "Basis of Presentation" section, the 2Q 2023 10-Q addressed Discover's compliance with GAAP, stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

207. The statements in paragraphs ¶¶204-205 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; and (5) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm.

### *August 14, 2023 Defendant Hochschild's Resignation*

208. The truth continued to emerge when, on August 14, 2023, Discover issued a press releasing announcing that Defendant Hochschild agreed to "step down as Chief Executive Officer and President and as a member of the Board." Specifically, the press release stated, in relevant part:

75

The Board is continuously focused on Discover reaching its full potential across the business, including our commitment to enhancing compliance, risk management and corporate governance. We will continue to take actions to advance Discover's strategic priorities and generate high returns and capital.

209. On this news, the price per share of Discover's stock fell $9.69, or 9.4%, from a closing price of $102.65 per share on August 14, 2023, to close at $92.96 per share on August 15, 2023. The price per share continued to decline the subsequent day, falling an addition $2.70, to close at $90.26 per share on August 16, 2023, approximately a 12.1% decline over two days.

*October 18, 2023 Press Release*

210. The truth continued to emerge on October 18, 2023, when Discover issued a press release reporting disappointing financial results for the third quarter of 2023, stating, in relevant part:

Total operating expenses were up $83 million year-over year, or 6%, primarily driven by expenses for professional fees, information processing, employee compensation and marketing. The increase in professional fees was driven by continued investment in compliance and risk management initiatives.

211. On this news, the price per share of Discover's stock dropped $7.26, or 7.9%, from a closing price of $91.85 per share on October 18, 2023, to close at $84.59 per share on October 19, 2023. However, the Individual Defendants continued to conceal the full truth regarding the Company's regulatory compliance and the true extent of the consequences resulting from Discover's Card Misclassification Misconduct and Student Loan Misconduct.

*October 26, 2023 10-Q*

212. On October 26, 2023, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended September 30, 2023 (the "3Q 2023 10-Q"). The 3Q 2023 10-Q was signed by Defendant Greene and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Owen and

Greene attesting to the accuracy of the 3Q 2023 10-Q. Further, Defendants Owen and Greene certified that:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

213. In its "Basis of Presentation" section, the 3Q 2023 10-Q addressed Discover's compliance with GAAP, stating: "The accompanying condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S. ('GAAP')."

214. The statements in paragraphs ¶¶211-212 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and risk management. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; and (5) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm.

**THE TRUTH FULLY EMERGES**

215.    The truth fully emerged on January 17, 2024, when, after the market closed, Discover issued the 4Q 2023 Press Release, which announced the Company's fourth quarter financial results. The press release revealed that Discover's "total operating expenses were up $267 million year-over-year, or 18%," and that "[o]ther expense increased as a result of a reserve for customer remediation."

216.    On January 18, 2024, during the 4Q 2023 Earnings Call, Defendant Owen, the Interim CEO at the time, clarified that the Company "increased [its] investments on risk and compliance in 2022 and 2023 up to about a $500 million level," noting that Discover has "made improvements in risk and compliance," but still had "quite a bit of work to do." Defendant Owen also addressed the $80 million remediation reserve, specifying that it related to "servicing issues" and that a "significant share of that was related to student loans," rather than the credit card misclassification misconduct.

217.    On this news, the price per share of Discover's stock fell by $11.74, or 10.8%, from a closing price of $108.74 on January 17, 2024, to close at $97.00 per share on January 18, 2024.

**SUBSEQUENT DEVELOPMENTS**

*2023 Financial Restatements*

218.    On November 25, 2024, Discover's Audit Committee concluded that previously filed reports, press releases, and earnings releases, particularly the report in the 2023 10-K "should no longer be relied upon. Discover's management concluded that its "internal control over financial reporting was not effective as of December 31, 2023, due to . . . material weaknesses," and thus these "material weaknesses" led to a "*material* misstatement of the Company's consolidated financial statements."

78

219. On December 24, 2024, the Company filed an Amended Annual Report for 2023 with the SEC (the "Amended 2023 10-K") which to restate certain inaccurate, previously reported financial results due to the disclosure of the Card Misclassification Misconduct.

220. The Amended 2023 10-K included "restated quarterly financial information pertaining to" previously issued unaudited condensed consolidated statements of (1) financial condition as of March 31, 2023, June 30, 2023, and September 30, 2023, (2) income, including related statements of comprehensive income , for the three months ended March 31, 2023 and 2022, three and six months ended June 30, 2023 and 2022, and three and nine months ended September 30, 2023 and 2022, (3) cash flows or the three months ended March 31, 2023 and 2022, six months ended June 30, 2023 and 2022, and nine months ended September 30, 2023 and 2022, and (4) changes in stockholders' equity for the three months ended March 31, 2023 and 2022, three and six months ended June 30, 2023 and 2022, and three and nine months ended September 30, 2023 and 2022.

221. The restatement largely impacted, *inter alia*, Discover's previously reported revenues associated with credit card interchange fees and previously reported earnings per share ("EPS"). As detailed in the Securities Class Action, Second Amended Complaint, ECF No. 125, ¶ 193, the restated EPS for 2023 was $0.55 lower than the original EPS:

**Basic EPS**

| | 1Q 2023 | 2Q 2023 | 3Q 2023 | 4Q 2023 | 2023 |
|---|---|---|---|---|---|
| **Original** | $3.58 | $3.54 | $2.59 | $1.54 | $11.26 |
| **Restated** | $3.50 | $3.49 | $2.21 | $1.45 | $10.71 |
| **Adjusted EPS** | ($0.08) | ($0.05) | ($0.38) | ($0.09) | ($0.55) |

| Adjusted % | -2.23% | -1.41% | -14.67% | -5.84% | -4.88% |
|---|---|---|---|---|---|

222. Although the Amended 2023 10-K noted that Discover "recognized a[n] [initial] liability of $365 million for counterparty restitution" following the Card Misclassification Misconduct, the Company later reported in its quarterly report for the period that ended March 31, 2024, "that it had to increase its counterparty restitution liability to $1.2 billion."

223. The Amended 2023 10-K further stated that Discover "did not have controls designed or implemented to ensure" credit cards were being correctly classified, which resulted in "inaccurate revenue recognition."

### 2025 Consent Order Update

224. Furthermore, on April 16, 2025, the FDIC issued the 2025 Consent Order Update, which amended and restated the 2023 Consent Order to expand on the FDIC's previous findings, adding an "Order of Restitution[ ] and an Order to Pay." Specifically, the FDIC continued investigating Discover's Card Misclassification Misconduct and issued the 2025 Consent Order Update after finding Discover violated, *inter alia*, Section 5 of the FTCA; the Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.*; the Servicemembers Civil Relief Act, 50 U.S.C. § 501, *et seq.*; and the Electronic Records and Signatures in Commerce Act, 5 U.S.C. § 7001, *et seq.*; as well as related implementing regulations.

225. To address the Company's continued Card Misclassification Misconduct, the 2025 Consent Order Update required the Company's Board to adopt "Account Classification Procedures" that include (1) "clear lines of authority and responsibility for establishing and monitoring adherence to applicable Account Classification Procedures by both" Discover and relevant third parties; (2) "processes for effective risk assessment of Account Classifications;" (3)

"processes for timely and accurate reporting related to Account Classification Procedures," including adherence to such procedures by Discover and relevant third parties; and (4) "processes for ensuring proactive and effective compliance with Consumer Protection Laws and Regulations."

226.    Additionally, the 2025 Consent Order Update required Discover to engage an "independent third party" approved by the FDIC to (1) "assess whether Account Classifications confirm to all Interchange Disclosures;" (2) "assess whether Account Classification Procedures are acceptable and satisfactorily provide (A) clear lines of authority and responsibility for establishing and monitoring adherence to applicable Account Classification Procedures by the Bank and any Third-Party Relationship involved with Account Classification; (B) processes for effective risk assessment; (C) processes for timely and accurate reporting; and (D) processes for ensuring compliance with Consumer Protection Laws and Regulations" (the "AC Assessment"); (3) "identify any inaccuracies in Account Classifications, discrepancies between Account Classifications and any Interchange Disclosures, gaps and/or areas where additional Account Classification Procedures are required or require enhancement;" and (4) prepare a written report with findings of the AC Assessment, including recommendations for Discover to address "any inaccuracies, discrepancies, gaps, deficiencies, weaknesses, issues and/or concerns."

## REPURCHASES DURING THE RELEVANT PERIOD

227.    During the Relevant Period, the Individual Defendants caused Discover to initiate repurchases of its common stock that substantially damaged Discover. In total, Discover spent an aggregate amount of approximately $6.4 billion to repurchase approximately 57.4 million shares of its own common stock at artificially inflated prices between April 2021 and June 2023.

228.     According to the quarterly report Discover filed on Form 10-Q with the SEC on July 29, 2021 (the "2Q 2021 10-Q"), between April 1, 2021 and April 30, 2021, Discover purchased 1,272,095 shares of its common stock at an average price of $100.88 per share for a total cost to the Company of approximately $128.3 million.

229.     As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $4.9 million for repurchases of its own common stock between April 1, 2021 and April 30, 2021.

230.     According to the 2Q 2021 10-Q, between May 1, 2021 and May 31, 2021, Discover purchased 1,720,604 shares of its common stock at an average price of $115.44 per share for a total cost to the Company of approximately $198.6 million.

231.     As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $31.7 million for repurchases of its own common stock between May 1, 2021 and May 31, 2021.

232.     According to the 2Q 2021 10-Q, between June 1, 2021 and June 30, 2021, Discover purchased 1,847,630 shares of its common stock at an average price of $120.72 per share for a total cost to the Company of approximately $223 million.

233.     As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $43.8 million for repurchases of its own common stock between June 1, 2021 and June 30, 2021.

234.     According to the quarterly report Discover filed on Form 10-Q with the SEC on October 28, 2021 (the "3Q 2021 10-Q"), between July 1, 2021 and July 30, 2021, Discover purchased 2,357,484 shares of its common stock at an average price of $121.47 per share for a total cost to the Company of approximately $286.3 million.

235. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $57.7 million for repurchases of its own common stock between July 1, 2021 and July 30, 2021.

236. According to the 3Q 2021 10-Q, between August 1, 2021 and August 31, 2021, Discover purchased 1,978,495 shares of its common stock at an average price of $129.35 per share for a total cost to the Company of approximately $255.9 million.

237. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $64 million for repurchases of its own common stock between August 1, 2021 and August 31, 2021.

238. According to the 3Q 2021 10-Q, between September 1, 2021 and September 30, 2021, Discover purchased 2,185,471 shares of its common stock at an average price of $123.84 per share for a total cost to the Company of approximately $270.6 million.

239. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $58.7 million for repurchases of its own common stock between September 1, 2021 and September 30, 2021.

240. According to the 2021 10-K, between October 1, 2021 and October 31, 2021, Discover purchased 2,257,543 shares of its common stock at an average price of $126.62 per share for a total cost to the Company of approximately $285.9 million.

241. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately

$66.9 million for repurchases of its own common stock between October 1, 2021 and October 31, 2021.

242. According to the 2021 10-K, between November 1, 2021 and November 30, 2021, Discover purchased 2,055,783 shares of its common stock at an average price of $116.37 per share for a total cost to the Company of approximately $239.2 million.

243. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $39.8 million for repurchases of its own common stock between November 1, 2021 and November 30, 2021.

244. According to the 2021 10-K, between December 1, 2021 and December 31, 2021, Discover purchased 2,168,583 shares of its common stock at an average price of $113.04 per share for a total cost to the Company of approximately $245.1 million.

245. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $34.8 million for repurchases of its own common stock between December 1, 2021 and December 31, 2021.

246. According to the 1Q 2022 10-Q, between January 1, 2022 and January 31, 2022, Discover purchased 2,403,383 shares of its common stock at an average price of $121.41 per share for a total cost to the Company of approximately $291.8 million.

247. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $58.7 million for repurchases of its own common stock between January 1, 2022 and January 31, 2022.

248. According to the 1Q 2022 10-Q, between February 1, 2022 and February 28, 2022, Discover purchased 2,130,640 shares of its common stock at an average price of $121.92 per share for a total cost to the Company of approximately $259.8 million.

249. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $53.1 million for repurchases of its own common stock between February 1, 2022 and February 28, 2022.

250. According to the 1Q 2022 10-Q, between March 1, 2022 and March 31, 2022, Discover purchased 3,271,604 shares of its common stock at an average price of $111.64 per share for a total cost to the Company of approximately $365.2 million.

251. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $47.9 million for repurchases of its own common stock between March 1, 2022 and March 31, 2022.

252. According to the 2Q 2022 10-Q, between May 1, 2022 and May 31, 2022, Discover purchased 2,655,357 shares of its common stock at an average price of $107.90 per share for a total cost to the Company of approximately $286.5 million.

253. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $28.9 million for repurchases of its own common stock between May 1, 2022 and May 31, 2022.

254. According to the 2Q 2022 10-Q, between June 1, 2022 and June 30, 2022, Discover purchased 3,092,353 shares of its common stock at an average price of $101.38 per share for a total cost to the Company of approximately $313.5 million.

255. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $13.5 million for repurchases of its own common stock between June 1, 2022 and June 30, 2022.

256. According to the 3Q 2022 10-Q, between July 1, 2022 and July 31, 2022, Discover purchased 2,099,205 shares of its common stock at an average price of $100.07 per share for a total cost to the Company of approximately $210.1 million.

257. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $6.4 million for repurchases of its own common stock between July 1, 2022 and July 31, 2022.

258. According to the 2022 10-K, between November 1, 2022 and November 30, 2022, Discover purchased 850,874 shares of its common stock at an average price of $107.77 per share for a total cost to the Company of approximately $91.7 million.

259. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $9.2 million for repurchases of its own common stock between November 1, 2022 and November 30, 2022.

260. According to the 2022 10-K, between December 1, 2022 and December 31, 2022, Discover purchased 5,031,837 shares of its common stock at an average price of $101.08 per share for a total cost to the Company of approximately $508.6 million.

261. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $20.5 million for repurchases of its own common stock between December 1, 2022 and December 31, 2022.

262. According to the 1Q 2023 10-Q, between January 1, 2023 and January 31, 2023, Discover purchased 3,783,000 shares of its common stock at an average price of $104.85 per share for a total cost to the Company of approximately $396.6 million.

263. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $29.7 million for repurchases of its own common stock between January 1, 2023 and January 31, 2023.

264. According to the 1Q 2023 10-Q, between February 1, 2023 and February 28, 2023, Discover purchased 3,157,000 shares of its common stock at an average price of $114.46 per share for a total cost to the Company of approximately $361.4 million.

265. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $55.1 million for repurchases of its own common stock between February 1, 2023 and February 28, 2023.

266. According to the 1Q 2023 10-Q, between March 1, 2023 and March 31, 2023, Discover purchased 4,341,133 shares of its common stock at an average price of $101.82 per share for a total cost to the Company of approximately $442 million.

267. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $20.9 million for repurchases of its own common stock between March 1, 2023 and March 31, 2023.

268. According to the 2Q 2023 10-Q, between April 1, 2023 and April 30, 2023, Discover purchased 3,222,300 shares of its common stock at an average price of $100.39 per share for a total cost to the Company of approximately $323.5 million.

269. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $10.9 million for repurchases of its own common stock between April 1, 2023 and April 30, 2023.

270. According to the 2Q 2023 10-Q, between May 1, 2023 and May 31, 2023, Discover purchased 1,898,752 shares of its common stock at an average price of $98.15 per share for a total cost to the Company of approximately $186.4 million.

271. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $2.2 million for repurchases of its own common stock between May 1, 2023 and May 31, 2023.

272. According to the 2Q 2023 10-Q, between June 1, 2023 and June 30, 2023, Discover purchased 1,595,280 shares of its common stock at an average price of $112.90 per share for a total cost to the Company of approximately $180.1 million.

273. As Discover's stock was actually worth only $97 per share, the price at which it was trading when the market closed on January 18, 2024, the Company overpaid by approximately $25.4 million for repurchases of its own common stock between June 1, 2023 and June 30, 2023.

274. Thus, in total, during the Relevant Period, Discover overpaid for repurchases of its own common stock by approximately *$784.8 million*.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE

275. Throughout the Relevant Period, the Individual Defendants had access to information regarding the Company's failure to comply with applicable regulations, including

knowledge about regulatory findings and consumer harm resulting from Discover's misconduct. Specifically, former employees made the Individual Defendants aware of such issues.

276. According to FE 2, Company executives "leaned on" compliance personnel to "do their controls and their compliance for them" instead of understanding compliance regulations and potential risks themselves.

277. FE 1 stated that management had known about Discover's compliance issues "for a long time." FE 1 also noted that Capozzi stated that regulatory findings had to be closed because it was a "big issue for Roger [Hochschild]" and that Capozzi "heavily implied" that Defendant Hochschild knew how many open regulatory findings there were.

278. FE 5 stated that, because regulatory information was presented to Discover's board on a quarterly basis, Defendant Hochschild would have received these reports and the supplemental information within the board package, which included an inventory of regulatory findings. Specifically, FE 5 stated that "the information was cascaded up for every board report."

279. FE 5 also stated that Discover's Compliance Committee, to which Defendant Hochschild was a member, met potentially "seven or nine times a year." Materials associated with these meetings included a page of various metrics and disclosures for each Discover product. FE 5 added that Defendant Hochschild was an active participant in these meetings.

280. Similarly, FE 6 disclosed that Defendant Hochschild received a "monthly scorecard on risk management activity," which was presented to him in "monthly business review" meetings; Defendant Hochschild also reportedly attended monthly review meetings for Discover's U.S. cards business and consumer banking businesses.

281. FE 6 stated that the risk scorecard showed "where the remediations were" for the cards business" and showed "month over month, how many projects were messed up and caused

89

consumer harm," including the number of open issues, how many had been closed, and delays in closing issues. Further, according to FE 6, these reports were emailed to Defendant Hochschild prior to the meetings for review, and FE 6 observed Defendant Hochschild reviewing the reports during meetings.

282. FE 6 also recalled that during a meeting that Defendant Hochschild attended, meeting attendees expressed concern about not having enough resources to properly address issues requiring remediation, as well as statements along the lines of "we do not have the right people with the right skillset" to resolve the compliance issues.

## DAMAGES TO DISCOVER

283. As a direct and proximate result of the Individual Defendants' conduct, Discover has lost and will continue to lose and expend many millions of dollars.

284. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

285. Such losses include, but are not limited to, over $784.8 million that the Company overpaid when it repurchased, at the direction of the Individual Defendants, its own common stock at artificially inflated prices during the Relevant Period before the truth emerged.

286. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein, including the Student Loan Misconduct and the Card Misclassification Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

90

287. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

288. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

289. As a direct and proximate result of the Individual Defendants' conduct, Discover has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's, and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

290. Plaintiff brings this action derivatively and for the benefit of Discover and Capital One to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Discover, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act.

291. Discover and Capital One are named solely as nominal parties in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

292. Plaintiff is a Capital One shareholder and was a Discover shareholder continuously *prior* to the Merger and has been a Capital One shareholder continuously *since* the Merger. Plaintiff will adequately and fairly represent the interests of Discover and Capital One in enforcing and

prosecuting their rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND REFUSED ALLEGATIONS**

293. On January 9, 2026, consistent with 805 ILCS 5/7.80, Plaintiff served the Litigation Demand on Capital One's Board. Plaintiff demanded Capital One's Board investigate, remediate and prosecute the claims alleged therein.

294. Specifically, Plaintiff demanded that Capital One's Board commence a civil action against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties. Plaintiff also demanded that Capital One's Board reform and improve the Company's corporate governance and internal policies to comply with all applicable laws and to protect Capital One from committing further wrongful or wasteful acts. Specifically, Plaintiff demanded that Capital One's Board, *inter alia*: (i) commence a civil action against each responsible individual to recover for the benefit of the Company; (ii) assess whether any third parties should be sued, such as Discover's financial advisors, auditors or attorneys; and (iii) adopt corporate governance improvements.

295. On January 28, 2026, Auerbach responded on behalf of Capital One, stating that the demand was referred to Capital One's Board for consideration at an upcoming meeting.

296. On February 4, 2026, Plaintiff's Counsel asked Auerbach when Capital One's Board was planning to discuss the Litigation Demand. The following day, Auerbach responded stating that he would inform Plaintiff's Counsel once the date was set.

297. A month later, on March 12, 2026, Auerbach informed Plaintiff's Counsel that the Litigation Demand was going to be considered by Capital One's Board at its regularly scheduled May 2026 meeting.

298.     On March 17, 2026, Plaintiff's Counsel responded asking whether the Board took or planned to take any other action in connection with the Litigation Demand, including whether Plaintiff's demand had been presented to Capital One's Board in any form and/or any committee had been or would have been formed before the May 2026 Board meeting.

299.     A month later, on April 15, 2026, Auerbach responded, stating again that Capital One's Board was going to consider the demand at the upcoming May 2026 Board meeting but did not identify any other action the Board had taken in the four (4) months since the Litigation Demand was served or any other steps the Board planned to take.

300.     On May 19, 2026, Auerbach informed Plaintiff's Counsel that during Capital One's May 8, 2026 Board meeting, the independent members of Capital One's Board determined that it was not in the best interest of Capital One to commence litigation or take any other action requested by the Litigation Demand.

301.     On June 3, 2026, Plaintiff's Counsel followed up with Auerbach asking whether the Board and the Company were willing to obtain tolling agreements to ensure the underlying claims of the Litigation Demand were preserved on the Company's behalf. The next day, Auerbach responded that he did not see a reason for the Company to obtain tolling agreements from the individuals identified in the Litigation Demand. Outside counsel and Plaintiff's Counsel later had a call about the proposed tolling agreement on June 15, 2026.

302.     On June 30, 2026, outside counsel for Defendants informed Plaintiff that they had connected with counsel for the individuals identified in the Litigation Demand, and they had declined Plaintiff's request to enter into tolling agreements.

303.     Capital One Board's rejection of the Litigation Demand was not an objective decision, reached in good faith with due care. Capital One's Board did not take steps to improve

93

the Company's corporate governance or internal controls, to rectify the misconduct of certain directors and officers, or to obtain tolling agreements.

304. The Board's rejection of the Litigation Demand was not an objective decision, reached in good faith with due care. Instead, it appears the Board simply engaged in the performative step of discussing the Litigation Demand at a Board meeting – without taking any proper action to address the serious allegations raised in the Litigation Demand. The Board did not take steps to improve the Company's corporate governance or internal controls, or to rectify the misconduct of certain directors and officers.

305. Because of Capital One Board's inaction, the Company remains exposed to additional harm from the wrongful conduct described herein. In furtherance of the Company's interests, and to avoid irreparable injury caused by any expiration of statute of limitations, the Plaintiff now brings this derivative action.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

306. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

307. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Discover's business and affairs.

308. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

309. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Discover.

94

310.    In breach of their fiduciary duties owed to Discover, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omission of material fact that failed to disclose, *inter alia,* that: (1) for approximately 15 years, Discover was misclassifying revenue related to interchange fees; (2) as demonstrated by the FDIC Consent Orders, Discover failed to create and maintain a CMS that ensured compliance with applicable consumer protections laws and regulations, allowing the Card Misclassification Misconduct to continue for the Relevant Period; (3) as a result of the foregoing, Discover overcharged customers; (4) due to improper revenue from the Card Misclassification Misconduct, Discover's financial conditions, results of operation, and cash flow were not accurately reported, and thus were not in compliance with GAAP; (5) Discover improperly executed its duties as a student loan servicer by engaging in deceptive and unfair practices, and thus violated regulations on student lending, as stated in the 2015 and 2020 CFPB Orders; (6) Discover's compliance and internal control failures were significant, as demonstrated by the 2015 CFPB Order and the 2020 CFPB Order, which addressed Discover's Student Loan Misconduct and Card Misclassification Misconduct; (7) Discover's repurchase suspension in July 2022 was tied to its Student Loan Misconduct; (8) once these failures were disclosed, Discover would be subjected to financial risk, enhanced regulatory oversight, and reputational harm; and (9) as a result of the foregoing, the Individual Defendants' statements about Discover's business, operations, and prospects were materially false and misleading when made.

311.    In further breach of their fiduciary duties, the Individual Defendants engaged in and/or caused the Company to engage in the Card Misclassification Misconduct and the Student Loan Misconduct and failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, while, at the same time, causing the

Company to repurchase millions of its own shares while the stock price was artificially inflated due to the false and misleading statements and omissions alleged herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

312. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

313. In yet further breach of their fiduciary duties, during the relevant period the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $2 million.

314. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

315. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

316.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

317.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

318.     Plaintiff, on behalf of Discover, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

319.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

320.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Discover.

321.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Discover that was tied to the performance or artificially inflated valuation of Discover or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

322.     Plaintiff, as a shareholder and representative of Discover, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

323.     Plaintiff, on behalf of Discover, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

324. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

325. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Discover, for which they are legally responsible.

326. As a direct and proximate result of the Individual Defendants' abuse of control, Discover has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

327. Plaintiff, on behalf of Discover, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

328. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Discover in a manner consistent with the operations of a publicly-held corporation.

147. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Discover has sustained and will continue to sustain significant damages.

148. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

149. Plaintiff, on behalf of Discover, has no adequate remedy at law.

98

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

150. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152. In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

153. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

154. Plaintiff, on behalf of Discover, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

155. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156. Discover and the Individual Defendants are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Individual Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

157. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Discover, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Discover, including the wrongful acts complained of herein and in the Securities Class Action.

158. Accordingly, the Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

159. As such, the Company is entitled to receive all appropriate contribution or indemnification from Individual Defendants.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Discover and Capital One, and that Plaintiff is an adequate representative of Discover and Capital One;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Discover and/or Capital One;

(c) Determining and awarding to Discover and/or Capital One the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing the Defendants to take all necessary actions to reform and improve corporate governance and internal procedures to comply with applicable laws and to avoid

100

repeating the damaging events described herein, including, but not limited to, the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the supervision of operations; and

2. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Discover and/or Capital One restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 5, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
1350 Avenue of the Americas, Suite 1200,
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Stuart Swaziek, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of ___July___ 2026.


_Stuart Swaziek_
Stuart Swaziek